### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

JANEL WORLD TRADE, LTD. AND
ORDER LOGISTICS, INC.

        Plaintiff,

v.

WORLD LOGISTICS SERVICES, INC.,
RICHARD FRANCIS, and BRIAN
GRIFFIN

        Defendants.

Civil Action No. 08-CV-1327

Judge Richard J. Sullivan

### DECLARATION OF VINCENT COPPOLA

I, Vincent Coppola, declare under penalty of perjury as follows:

1.    I am a senior associate in the law firm of Pribanic & Pribanic. I submit this declaration in support of Defendant Richard Francis' motion to dismiss for failure to state a claim upon which relief can be granted.

2.    A true and accurate copy of the Purchase Agreement between Janel and Defendants is annexed hereto as Tab 1.

3.    An Affidavit and Declaration of Richard Francis sworn to on May 23rd, 2008 is submitted in support of Defendant Richard Francis' motion to dismiss for failure to state a claim upon which relief can be granted and is annexed hereto as Tab 2.

4.    A true and accurate copy of the Complaint filed by Plaintiffs is annexed hereto as Tab 3.

Signed under the pains and penalties of perjury this 23rd day of May, 2008.

Vincent Coppola

# TAB 1

## ASSET PURCHASE AGREEMENT

This Agreement is made on October 18, 2007 by and among JANEL WORLD TRADE, LTD. ("Janel"), a Nevada corporation, with its principle office at 150-14 132nd Avenue, Jamaica, New York, 11434; JANEL NEWCO, INC., a Nevada corporation with its principle office at 150-14 132nd Avenue, Jamaica, New York, 11434 ("Buyer"); and ORDER LOGISTICS, INC. ("Seller").

WHEREAS, Seller desires to sell and Buyer desires to purchase assets of Seller in exchange for consideration, and the assumption of certain liabilities of Seller, all as set forth in this Agreement; and

WHEREAS, the transaction contemplated hereby is intended to be accounted for as a "purchase" in accordance with Generally Accepted Accounting Principles ("GAAP") and applicable Securities and Exchange Commission ("SEC") regulatory standards governing such a transaction.

In consideration of the mutual promises contained herein, Buyer and Seller agree as follows:

1.     **Seller.** Seller is engaged in the business of offering an internet-based collaborative logistics management and tracking solution by providing a single, integrated technology platform which enables customers to collaborate with logistics professionals for the planning, execution, management and tracking of shipments, and financial settlement and control of their shipments to and from anywhere in the world across the supply chain..

2.     **Purchase and Sale.** Subject to the terms and conditions set forth in this Agreement, the Seller will sell to Buyer and Buyer will purchase from Seller, on the Closing Date, the properties, assets (tangible and intangible) and business of Seller as a going concern, excluding only the

assets set forth on the attached Schedule 2, which will be referred to as "Excluded Assets." The assets to be purchased are all the assets of Seller (other than Excluded Assets) owned, leased, licensed or used by Seller in the conduct of its business. Buyer will acquire and operate the business conducted by Seller as described in Section 1. The assets being purchased shall include, without limitation, all of the Seller's right, title and interest to:

2.1    the computer software and hardware, title and/or licenses for the exclusive ownership and use of all intellectual property required to own and use the software, hardware, patents, copyright, trademarks and all property set forth on Schedule 2.1, and all improvements thereon, and any other assets related thereto or in connection therewith;

2.2    accessory equipment, set forth on Schedule 2.2;

2.3    all other personal property, including, but not limited to, machinery, equipment, computers, software, source codes, furniture and fixtures, set forth on Schedule 2.3;

2.4    prepaid expenses, set forth on Schedule 2.4, related to the assets, business and liabilities being acquired by the Buyer pursuant to this Agreement;

2.5    all documentary and computerized records relating to the acquired property;

2.6    books, records, Financial Records, and marketing materials relating to the acquired property;

2.7    the name "Order Logistics" and any other trade names, service marks, trademarks, copyrights, patents, and other intellectual or proprietary property, and all registrations and applications pertaining thereto, all set forth on Schedule 2.7 attached, including, but not limited to, proprietary technology, know-how, manuals, trade secrets, processes, and technical expertise, and the goodwill thereof and of the business of Seller;

2.8    business agreements, including, but not limited to, agreements for the sale,

purchase, lease or license of goods, services or property of any kind as well as debt instruments, credit agreements, loans, notes and guarantees, set forth on Schedule 2.8;

2.9     customer contracts and customer lists, set forth on Schedule 2.9;

2.10    employee lists, including status, social security number and current compensation of each employee, and employment, consultant, independent contractor, union and collective bargaining agreements, set forth on Schedule 2.10;

2.11    certain insurance policies, set forth on Schedule 2.11; and

2.12    permits, authorizations, licenses, franchises, approvals or consents from any regulatory or administrative body or organization, or governmental or quasi-governmental body or agency, set forth on Schedule 2.12, to the extent that they are assignable or transferable.

The transfer of all personal property and contracts, and the assumption of certain liabilities and obligations, hereunder shall be deemed to take place on the Closing Date. This Agreement constitutes the transferring of all right, title and interest in the intellectual property described in this Agreement and Section 2.1, Section 2.7, and as set forth on Schedule 2.1 and Schedule 2.7.

## 3.    Purchase Price; Obligations to Janel; Expenses.

3.1     *Purchase Price.*  The Purchase Price is Three Million Eight Hundred Seven Thousand Dollars ($3,807,000).  At the Closing, the Purchase Price shall be paid as follows:

(a)     *Cash Consideration.*  Consideration paid in cash will total Two Million Three Hundred Eighty Two Thousand Dollars ($2,382,000), and is comprised of the following obligations of the Seller which will be assumed by the Buyer;

(i) The Seller's obligation to the National Bank of South Carolina in the principal amount of $648,000, provided that interest accrues at an interest rate no more than the prime rate

51754.doc                                                     3

at J.P. Morgan Chase Bank, N.A., less 0.5%, of which $148,000 of principal will be paid at Closing, together with $7,854.08 of accrued and unpaid interest;

(ii)  Payment of the Seller's obligation to Iron &Glass Bank of the principal amount of $629,291.72, which will be paid at Closing;

(iii)  Payment of the Seller's obligation to Marine Bank in the amount of $152,711.57 at Closing;

(iv)  Payment of the Seller's obligation to Greater Bay Business Funding in the amount of $140,000 at Closing;

(v)  Payment of $225,000 of the Seller's overdue payroll taxes incurred by its JAT subsidiary at Closing;

(vi)  Payment of $112,842.31 to satisfy certain of the Seller's accounts payable at Closing which are set forth on Schedule 3.1(a)(v); and

(vii)  Payment of $148,000 for the Seller's first and second fiscal quarter 2007 payroll taxes at Closing; and

(vii)  Payment of $85,000 to Richard Francis at Closing, and payment of $125,000 to Brian Griffin on March 30, 2008.

(b)  *Stock Consideration.*  Buyer shall authorize an issue of 285,000 unregistered shares of $0.001 par value Series B Convertible Preferred Stock (the "Janel Shares"). which will be non-voting shares and will be convertible into Janel's unregistered shares of $0.001 par value Common Stock two (2) years after issuance, of which 80,000 unregistered Janel Shares will be issued to the Seller at Closing, and 205,000 shares will be issued to the 16 persons in the amounts set forth on Schedule 3(b), all subject to the applicable rules of the Securities and Exchange Commission ("SEC").

51754.doc                                                                                              4

(c)     The Janel Shares will be valued at the closing price of Janel's Common Stock in the public markets on the day of the Closing as if they had already been converted into shares of Janel's Common Stock.

3.2     *Obligations Owed to Janel.*  Seller is currently indebted to Janel for services rendered in the sum of $152,533.10, which must be paid in full on or before Closing, failing which Janel has the right to reduce the amount of any of assumed Seller liabilities set forth in Section 3.1(a) by the amount of the unpaid balance due, in Janel's sole discretion.

3.3     *Other Expenses.*  Each party hereto shall pay and bear his or its own fees and expenses incident to the negotiation, preparation, and execution of any documents or transactions contemplated by this Agreement and any meeting of their respective boards or shareholders, as applicable, other than as expressly provided for in Section 3.2.

3.4     *Purchase Price Adjustment.*  Seller agrees that the Buyer has the right to a downward adjustment of the Purchase Price (the "Purchase Price Adjustment") if after the Closing the Buyer becomes obligated to pay any sales, use, value added, excise, import, privilege, or other similar taxes, levies, or payments in lieu thereof, and accrued interest or penalties thereupon (collectively, the "Unpaid Sales Taxes"), which are imposed by any governmental authority and arise out of or in connection with Seller's operations of its business prior to Closing including, but not limited to, the sale of products or the performance of services by the Buyer. The amount of the Unpaid Sales Taxes will be deducted parri passu from the Purchase Price dollar-for-dollar, first by Janel's cancellation of that number of Janel Shares in the Stock Consideration at the issuance value of those Janel Shares, and then by reimbursement to Janel of the Cash Consideration, up to a sum equivalent to the amount of the Unpaid Sales Taxes.

51754.doc                                                    5

3.5    *Objections.*

(a)    If Buyer or Seller object (the "Objection") to the calculation of the Unpaid Sales Taxes, either of them may make the Objection in a written request to the other parties hereto for a recalculation (a "Request"). If such a Request is made, and within five (5) business days of its receipt, at least one authorized representative from each of the parties shall meet or confer and make a good faith effort to resolve the Objection posed in the Request.

(b)    If the Objection cannot be resolved within five (5) business days from the first meeting or conference of the representatives, unless the delay is merely as a result of a scheduling conflict, (the "Resolution Period") then, within ten (10) business days after the expiration of the Resolution Period (the "Selection Period"), each of Buyer and Seller shall select a certified public accountant ("CPA"), and one CPA shall be randomly selected from the members of the American Institute of Certified Public Accountants ("AICPA") who provide such auditing or calculation services. Each CPA selected shall be a duly qualified CPA in good standing with respect to his certification in the State of New York. The three CPAs so chosen shall recalculate the amount that is the subject of the Objection by majority vote and, within thirty (30) days from the expiration of the Selection Period, furnish the parties with a writing, approved by a majority of the CPAs, setting forth the recalculated amount and briefly describing the manner in which it was determined. The amount that is arrived at by the majority vote of the CPAs shall be the amount used as the Unpaid Sales Taxes.

(c)    The parties shall share equally all of the expenses and fees associated with resolving the Objection under this Section. Any party hereto shall have the right to seek specific enforcement or other equitable relief or remedies at law in court for any breach or threatened breach of this Section.

3.6     *Allocation of Purchase Price*. Janel and Buyer shall have the exclusive and sole right to allocate the Purchase Price among the acquired assets. Seller agrees that such allocation is the proper allocation of the Purchase Price in accordance with the fair market value and ownership of the assets. Seller and Buyer agree to report the federal, state and local income taxes and other tax consequences of the transactions contemplated hereby, including the reporting of information required under Section 1060(b) of the IRC, in a manner consistent with such allocation. Seller and Buyer further agree not to take any tax position inconsistent with such allocation in connection with (a) the preparation of their respective Financial Records, tax returns, reports to shareholders, reports to governmental authorities or otherwise, (b) any examination of their tax returns or any refund claims, or (c) any litigation, investigations or other proceedings involving any of their tax returns. Seller and Buyer each agree to furnish to the other a copy of IRS Form 8594 (Asset Acquisition Statement under Section 1060 of the IRC) as filed with the Internal Revenue Service by such party pursuant to Sections 755 and 1060 of the IRC within thirty (30) days following such filing.

3.7     *Sales and Use Taxes; Recording Expenses*. Buyer agrees to pay any and all taxes payable in connection with the consummation of the transactions contemplated by this Agreement and the sale, conveyance or assignment of the assets hereunder (other than Unpaid Sales Taxes, and income taxes incurred by Seller or resulting directly from such sale, which shall be borne by Seller), including sales and use taxes, and to prepare and file any necessary tax returns in connection therewith. Buyer further agrees to pay all filing and recording fees relating to the filing and recording of any instruments delivered by Seller to convey the assets to Buyer, if any.

4.     **Seller's Representations, Warranties and Covenants.** The Seller represents and warrants to Buyer and Janel that, as of the date hereof, for the period of time until the Closing

Date, if such date is later than the date hereof, and on the Closing Date:  ·

4.1    *Organization and Good Standing.*  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own, use, operate, lease and license its assets and to carry on its business as now being conducted with all requisite corporate power and authority to (a) execute, deliver and perform its obligations under this Agreement and other agreements contemplated hereby and (b) consummate the transactions contemplated hereby and thereby.  Seller is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its business or the ownership, usage, operation, lease or license of its assets requires such qualification.

4.2    *Authorization.*  The execution and delivery by Seller of this Agreement, the performance by Seller of its and his obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary corporate action. This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms.

4.3    *Consent; Notice.*  No consent, notice, approval, exemption, permit, license, or authorization ("Consent") is required to be obtained by Seller, and no filing is required to be made with, any person or entity, including, but not limited to, any creditors of Seller (a) in order for this Agreement to constitute a legal, valid and binding obligation of Seller or, (b) to authorize or permit the consummation by Seller of the transactions contemplated hereby or; (c) under or pursuant to any Consents held by or issued to Seller (including, without limitation, environmental, health, safety and operating permits and licenses) by reason of this Agreement or the consummation of the transactions contemplated hereby, except as set forth on Schedule 4.3 attached. Buyer agrees to cooperate with Seller in seeking any required Consents, except that if a

51754.doc                                                    8

Consent is required and such Consent cannot be secured, Buyer will not have any liability to Seller with respect to such agreement or document as to which such Consent cannot be secured.

4.4     *Omitted*

4.5     *Environmental Conditions.*   Seller, to its knowledge, has conducted its business operations in compliance with all applicable Environmental Laws, and to its knowledge, there is no event, condition, circumstance, activity, practice, incident, action or plan which interferes with or prevent its business operations from being in continued compliance with any Environmental Law.

4.6     *Personal Property.*   Seller owns, leases, or licenses certain property set forth in Sections 2.1, 2.2, 2.3, 2.7, 2.8, 2.11, 2.12, and 2.13, and will own or have in effect valid, enforceable leases or licenses and good marketable title to all such property. None of such property is or will be subject to any (a) contracts of sale, leases, or licenses or (b) Liens of any kind or character, other than as indicated on Schedule 4.6.

4.7     *Intellectual Property.*

(a)     Seller has and will have the right to use the name "Order Logistics," and all trade names, service marks, patents, copyrights, trade marks, and other like intellectual or proprietary property, and the goodwill pertaining to each and to the business of Seller, and all of said rights are, and will be, free and clear of all royalty obligations, Liens, expenses, attorney's fees for services, and governmental, quasi-governmental, regulatory or administrative fees. There are no pending claims or known demands of infringements asserted by any person or entity. Seller has no knowledge of any conflicting use of any of such property or rights. To Seller's knowledge, Seller's use of said intellectual property and any proprietary property or technology of Seller is not in violation of any law or regulation or breach of any agreement or instrument.

(b)    Seller has no trade names, service marks, patents, copyrights, trademarks or other intellectual or proprietary property other than as set forth on Schedule 2.7.

4.8    *Employee Plans.* Seller has no employee benefit plans (as defined in section 3 (3) of the Employee Retirement Income Security Act of 1974), except those set forth on Schedule 2.11 ("Benefit Plans").

4.9    *Insurance.* All policies of insurance of any kind maintained, owned or held by Seller are set forth on Schedule 2.11 and such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no notice of cancellation or termination has been received with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation or termination. The insurance policies to which Seller is a party are sufficient for compliance with all requirements of applicable laws and all agreements to which Seller is a party or by which Seller or its assets are bound, and the coverage provided by said policies are sufficient to cover all risks insured against. Seller will maintain insurance coverage, in amounts deemed adequate by Seller's management, against all risks presently insured against. In the event any such insurance policy is not acquired or assumed by the Buyer or Janel by the Closing Date, Seller shall not be responsible for the maintenance of any such insurance coverage after the Closing Date, unless otherwise agreed between Buyer and Seller.

4.10    *Permits; Licenses.* Schedule 2.12 sets forth all of the Consents and franchises which have been issued to or are held or used by Seller, or for which Seller has applied. Seller has obtained all of the Consents and franchises which are necessary for the ownership and use of the Purchased Assets, the conduct of its business, and the consummation of the transactions contemplated hereby. All such Consents and franchises are in full force and effect, no violations

exist or have been recorded in respect of any thereof, and no proceeding is pending or threatened to revoke or limit any thereof.

4.11   *Financial Records.* Seller's Financial Records and tax returns have been prepared in the normal course of business using normal good faith allocations and in accordance with GAAP, consistently applied, and present fairly all the assets, liabilities and results of operations of Seller for the periods specified. Janel shall have made a review of Seller's Financial Records, including for the years ended December 31, 2006 and 2005. The accounts and notes receivable reflected on the Financial Records represent bona fide claims of Seller against debtors for sales or advances made or services performed in the ordinary course of business and have been collected or are and will be good and collectible in the ordinary course of business. Except as set forth on Schedule 4.11 attached, Seller has no knowledge of any such receivables that are uncollectible, in controversy or subject to offset or counterclaim. Schedule 4.11 also sets forth (a) Seller's standard terms and conditions for sales and collections and (b) a list of those customers to which such standard terms and conditions do not apply, if any, and a description of such non-standard terms on a customer by customer basis.

4.12   *Tax Matters.* All required federal, state, county, town, city and village tax reports and returns of Seller have been and will be properly and accurately filed, and all taxes due thereunder have been paid or adequate reserves therefore have been established. Seller shall make available to Buyer and Janel such financial and tax information and give access to Seller's books and records as Buyer or Janel may reasonably require for all diligence purposes, the preparation of Financial Records, and for audits.

4.13   *Capital Expenditures.* Seller has delivered a schedule of all monies disbursed on account of capital expenditures made by it since December 31, 2006 to the date hereof (attached

51754.doc                                                    11

hereto as Schedule 4.13) in excess of $5,000. After the date hereof, no capital expenditures or commitments in excess of $1,000 will be made by Seller for the business of Seller, except with Buyer's prior written consent.

4.14    *Absence of Undisclosed Liabilities.*    To the knowledge of Seller, there are no liabilities (direct or contingent) of Seller as to which a claim has been or may be made that would materially affect the Purchased Assets or the business of Seller, except those expressly assumed by Buyer as set forth on Schedule 4.14.

4.15    *No Breach.*    The execution and delivery by Seller of this Agreement, the performance by Seller of its and his obligations hereunder, and the consummation by Seller of the transactions contemplated hereby will not (a) conflict with, result in any violation of, or constitute a default under, Seller's Certificate of Incorporation or By-Laws, in each case as amended to date, (b) constitute a default under, result in a violation or breach of, result in the cancellation or termination of, accelerate the performance required under, or result in the creation of, any Lien upon any of the Purchased Assets pursuant to any agreement, mortgage, guaranty, deed of trust, note, indenture, bond, lease, license or other instrument to which Seller is a party or by which any of Seller's assets are bound, or (c) result in to Seller's knowledge a material violation of or conflict with any law, ordinance, rule, regulation, order, writ, judgment, award, edict or decree applicable to Seller, its business or the Purchased Assets.

4.16    *Litigation*    Other than as set forth on Schedule 4.16, there are no outstanding suits, actions, proceedings, investigations, audits, claims, or awards pending or, to the best knowledge of Seller, threatened against Seller, its business or the Purchased Assets (collectively, "Litigation") and, to the best knowledge of Seller, there is no basis for any such Litigation. There are no orders, judgments, writs or decrees outstanding against Seller, its business or the

# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JANEL WORLD TRADE, LTD.**<br>and **ORDER LOGISTICS, INC.,** ) | Civil Case No. 08-1327 |
| ) | |
| Plaintiffs, ) | Judge Richard J. Sullivan |
| vs. ) | |
| ) | |
| **WORLD LOGISTICS SERVICES, INC.,** ) | |
| **RICHARD FRANCIS,** and **BRIAN GRIFFIN,** ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT AND DECLARATION OF RICHARD FRANCIS

Richard Francis hereby deposes under penalty of perjury and states as follows:

1.  I am the Richard Francis named as a defendant in this litigation.

2.  I submit this affidavit and declaration in order to transmit a particular document to this Court in connection with a Motion to Dismiss that my attorney will file on my behalf.

3.  Attached as **Tab 1** hereto (and also attached as **Tab 1** of my Motion to Dismiss) is an unsigned, albeit true and accurate copy of the "Purchase Agreement" to which the plaintiffs refer in several paragraphs of their complaint.

4.  I further declare and swear that I have never received from the plaintiffs any of the Series B Convertible Preferred Stock that is referenced in § **3.1(b)** and **Schedule 3** of the "Purchase Agreement," such stock of which constituted part of the consideration I was to have received from the plaintiffs for the sale of the assets described in the Purchase Agreement.

Further the affiant sayeth not.

Sworn to me this
23rd day of May, 2008

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Julie A. Loya, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires May 12, 2011
Member, Pennsylvania Association of Notaries

By:  Richard Francis

101 East Crafton Avenue
Pittsburgh, PA  15205

# TAB 3

William J. Davis (WD 0362)
SCHEICHET & DAVIS, P.C.
Attorneys for Plaintiffs
767 Third Avenue, 24th Floor
New York, New York 10017
(212) 688-3200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF CASE

----------------------------------------------------------------------X

JANEL WORLD TRADE, LTD., and ORDER
LOGISTICS, INC.,

                                      Plaintiffs,

                   -vs-

WORLD LOGISTICS SERVICES, INC., RICHARD S.
FRANCIS, and BRIAN P. GRIFFIN,

                                     Defendants.

:    Case No. _____

:    **COMPLAINT AND
JURY DEMAND**

:

----------------------------------------------------------------------X

Plaintiffs Janel World Trade, Ltd. ("Janel") and Order Logistics, Inc. ("Newco"), both

Nevada corporations, by their attorneys, Scheichet & Davis, P.C., as and for their Complaint

against the Defendants state as follows:

## SUMMARY AND NATURE OF THE ACTION

1.     Plaintiff's Janel and Newco bring this action arising out of the fraudulent

activities and material breaches of contract by defendants World Logistics Services, Inc. ("World

Logistics"), a Delaware Corporation formerly known as "Order Logistics, Inc.;" Richard S.

Francis ("Francis"), the President of World Logistics; and Brian P. Griffin ("Griffin"), the Chief

Executive Officer of World Logistics, by which they induced the Plaintiffs purchase of

"exclusive" rights to certain World Logistics assets when, in fact, World Logistics and Francis

had compromised the exclusivity by having secretly granted the right to use or absorb those

assets to a third party creditor named Braddock Cunningham ("Cunningham"). Defendants

made false and misleading statements of material facts to the Plaintiffs concerning the exclusivity of the rights to assets which Defendants offered and sold to the Plaintiffs, most notably by concealing and withholding their agreement with Cunningham (the "Cunningham Agreement"), made only two days before the closing of the asset sale, in which they agreed to the cancellation of a restrictive covenant which had barred Cunningham from using World Logistics proprietary computer software, or soliciting its list of valuable customers and the World Logistics employees operating out of their Greenville, South Carolina office, which were the most valuable assets and "exclusive" rights which the Plaintiffs were purchasing from World Logistics.

2.    Defendants made false and misleading statements, and omitted material information, with the specific intent to defraud the Plaintiffs and obtain for their own use and benefit 285,000 shares of newly authorized Class B convertible preferred stock of Janel (the "Class B Shares," each share convertible into 10 shares of Janel common stock) with a current value of approximately $3,700,000, together with payment by Janel of Defendants long overdue debts amounting to more than $2,300,000, and $125,000 to Griffin. Plaintiffs have been damaged in an amount to be determined at trial, which they believe to be not less than $2,925,000.

3.    Plaintiffs assert causes of action identified below against the Defendants, jointly and severally, pursuant to §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) (the "1934 Act"); Rule 10b-5 promulgated thereunder, 17 C.F.R. §240; and 1934 Act §20(a), 15 U.S.C. §78t. Plaintiffs also assert common law causes of action against the Defendants for Fraud, Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing, Conversion, and Unjust Enrichment.

2

51843-3

## THE PARTIES

4.      Plaintiff Janel is a Nevada Corporation with its principle place of business in Jamaica, New York, close to J.F.K. International Airport. Janel has been in business since 1974 as a logistics services provider for importers and exporters worldwide. Janel is a Securities and Exchange Commission ("SEC") reporting company which has been publically-held since July 2002, with its common stock traded on the NASDAQ-administered Over-The-Counter Bulletin Board. Newco is a Nevada Corporation and wholly-owned subsidiary of Janel, which purchased assets and the freight logistics operations of World Logistics, including but not limited to its proprietary computer software for the freight logistics business, its customer list, and its lease-hold offices in Champaign, Illinois and Greenville, South Carolina. Newco acquired the corporate and trade name "Order Logistics, Inc." from World Logistics, and has since changed its name to "Order Logistics, Inc."

5.      Upon information and belief, World Logistics is a Delaware corporation incorporated in 2006 (with its principle place of business located at 3 Crafton Square, Pittsburgh, Pennsylvania 15205), which had been in the business of arranging transportation of goods for various companies utilizing sophisticated proprietary computer software to provide to each customer with constant visibility, information and control over their unique distribution networks by the utilization of the customer's existing information systems to obtain access to all of this information. World Logistics has been a non-reporting publically-held company since December 2005, with its common stock traded on the Pink Sheets market.

6.      At all relevant and material times;

3

cnnic ?

(a)     Defendant Francis has been the President and a principle shareholder of World Logistics, with his principle place of business at 3 Crafton Square, Pittsburgh, Pennsylvania 15205, and

(b)     Defendant Griffin has been the Chief Executive Officer and a principal shareholder of World Logistics, with his principal place of business in Champaign, Illinois.

7.     Upon information and belief, Francis continues operating World Logistics in a trucking company related transportation business in areas which do not involve the various assets and "exclusive" rights which World Logistics sold to the Defendants.

8.     Upon information and belief, Plaintiffs allege that each Defendant is the agent and/or conspirator of the other Defendant, and knowingly approved, participated in, and/or ratified the wrongful actions and omissions herein alleged, and are thus mutually responsible for the wrongful conduct of each other.

## JURISDICTION AND VENUE

9.     This is an action for money damages, cancellation of Class B Shares, and other appropriate relief arising, among other statutes, under §10(b) and Rule 10b-5 of the 1934 Act, 15 U.S.C. §78j(b), and 1934 Act §20(a), 15 U.S.C. §78t. This court has original, federal question jurisdiction over the claims arising under these Federal statutes pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over all remaining claims pursuant to 28 U.S.C. §1367. Alternatively, this court has jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. §1332, as well as the principles of the pendent jurisdiction. The wrongdoing of the Defendants which is alleged herein took place in New York County and Queens County, and included the use of the means and instrumentalities of interstate commerce. Moreover, Section 11.2 of the Asset Purchase Agreement dated October 18, 2007 by and among Janel, Newco, and World Logistics

4

(the "Purchase Agreement") provides that all disputes or legal actions or proceedings arising out of, or based upon, or in connection with that Purchase Agreement must be brought only in the State and Federal courts located in New York County, and each party covenanted and agreed to not dispute such jurisdiction or venue, and explicitly consented to the personal jurisdiction of such courts.

10.    Venue lies in this District pursuant to 28 U.S.C. §1391, in that (a) most of the Defendants wrongful acts occurred within this District, (b) during all material times, the Defendants were present in the Southern District of New York, transacted business in this District and frequently traveled to and from this District for the conduct of business, and (c) the Defendants knowingly and irrevocably consented to jurisdiction and venue in this District.

### FACTS AND ALLEGATIONS
### COMMON TO ALL CAUSES OF ACTION

11.    Janel was introduced to World Logistics (then named "Order Logistics") in or about August 2006, and the two companies negotiated and executed a "Strategic Memorandum of Understanding" which was designed to benefit both companies by marketing joint global supply-chain capabilities to both companies' customers, whereby Janel would be able to provide freight logistics services to its own customers, and certain World Logistics customers, utilizing sophisticated and proprietary World Logistics computer software (the "Proprietary Logistics Software") which enabled Janel and the customers to track the entire process and progress of the supply chain in the manufacturing, packaging, shipping and delivery of the goods being manufactured overseas and distributed in the U.S.

12.    In early August 2007, Janel and World Logistics pursued a transaction between them in which Janel and Newco would purchase the exclusive rights to certain proprietary assets of World Logistics comprised principally of the Proprietary Logistics Software, the customer list,

and the Champaign, Illinois and Greenville, South Carolina offices and staff.

13. During the course of the negotiations between Janel and World Logistics, and the many conversations by telephone, in person, and by email and fax messages, Francis repeatedly represented to the Janel officers, directors and advisors that Janel would receive exclusive rights to the assets being purchased from World Logistics.

14. In the course of Janel's due diligence review of the business records and financial material of World Logistics, Janel learned of a number of liens resulting from financing agreements and overdue obligations owed by World Logistics to a number of suppliers, banks, financing companies, and the Internal Revenue Service (for unpaid and overdue payroll taxes) aggregating approximately $2,300,000.

15. Upon information and belief, Francis and Griffin were "responsible officers" of World Logistics who were personally liable for the unpaid and overdue payroll taxes, and personal guarantors of various World Logistics debt obligations including, but not limited to, a $648,000 debt owed to the National Bank of South Carolina by World Logistics.

16. Upon information and belief, the Proprietary Logistics Software had been developed by a company named eBridge Technologies, Inc. ("eBridge"), which World Logistics had acquired as a subsidiary pursuant to agreements with Cunningham and others dated June 1, 2006 and December 20, 2006 (collectively, the "Cunningham Agreements").

17. Upon information and belief, Cunningham had filed a Uniform Commercial Code ("UCC") financing statement lien in South Carolina against all of the assets of World Logistics in October 2006.

18. Upon information and belief, World Logistics breached the Cunningham Agreements, with resulted in Cunningham declaring a default.

6

19.     On or before October 5, 2007, World Logistics, Francis, Griffin, and their attorneys and advisors had received and reviewed the draft Purchase Agreement which, in Articles 2.1, 2.7, 2.8, 2.12, 4.7, 4.19, 4.22 and other provisions, explicitly and repeatedly required that all outstanding liens had to be satisfied and released, and all of the assets and rights being conveyed to Plaintiffs were to be *exclusive and without any conflicting use* (emphasis supplied), and that World Logistics had no knowledge of any claims, infringements, or conflicting use by any person.

20.     On October 5, 2007, Janel received a letter from Cunningham's lawyer (the "Cunningham Letter") asserting material default by World Logistics in compliance with the Cunningham Agreements, a UCC security interest in all of the World Logistics assets, knowledge of the pending Purchase Agreement, and a demand that no transaction be consummated without Cunningham's consent.

21.     Janel immediately advised World Logistics, Francis, Griffin, and their attorneys of the Cunningham letter by email.

22.     Defendants replied to the Janel email message within minutes, and advised its officers that the dispute with Cunningham would be promptly resolved, and the lien would be lifted.

23.     On October 10, 2007, Janel received a copy of an email from Francis to the lawyers for World Logistics, Griffin, Cunningham, and others saying that there was a settlement agreement with Cunningham (the "Cunningham Settlement").

24.     On October 12, 2007, Janel received a copy of an email sent by the lawyer for World Logistics to Cunningham's lawyer asking for confirmation that he could file the lien release upon Cunningham receiving a payment of $7,500 and 30,000 Class B Shares of Janel,

7

which was followed seven minutes later by a copy of a confirming email from Cunningham's lawyer.

25.     Neither World Logistics, nor Francis or Griffin or any other officer, director, attorney or representative of World Logistics, provided any other information to Janel or any officer or representative of Janel regarding the terms and provisions of the Cunningham Settlement prior to the closing of the Purchase Agreement on October 18, 2007.

26.     In fact, the Cunningham Settlement was executed on or about October 10, 2007, and in addition to the payment of $7,500 and 30,000 Class B Shares of Janel, the agreement granted Cunningham rights to the World Logistics intellectual property, trade names, and its customer list and contacts, which it had promised to sell exclusively to Newco:

> 4.   OLI also agrees that Cunningham shall have the nonexclusive right to use for any purpose the "eBridge" name and any goodwill associated therewith, eBridge's intellectual capital to include eBridge's software solutions, including the right to the techniques used to create the software deployed at eBridge, Inc. The parties expressly acknowledge and agree that Cunningham may develop new software that is related to eBridge's software solutions and that any intellectual property rights arising therefrom are the exclusive property of Cunningham. OLI acknowledges and agrees that it has no intellectual property rights to any software developed by Cunningham after the Effective Date of this Agreement and is not granted a license thereto.

> 5.   OLI further acknowledges that it has already released Cunningham from any and all agreements not to compete in the December 20, 2006 agreement and that Cunningham is free to compete directly with OLI in any market or business, including but not limited to, soliciting OLI's customers, suppliers, and employees.

27.     The Defendants knew, or should have known in the exercise of reasonable diligence, that these provisions of the Cunningham Settlement destroyed the exclusivity of the intellectual property rights and customer list which were sold "exclusively" to Janel a few days later.

8

28.     Upon information and belief, this material information was knowingly and intentionally hidden from Janel and its representatives prior to the signing and closing of the Purchase Agreement, which constitutes an intentional violation of the material terms of the Purchase Agreement and the World Logistics representations and warrantees.

29.     Janel first learned of these events from an email sent to Janel by Cunningham on December 10, 2007 regarding claims he has against World Logistics and Francis.

30.     World Logistics, Francis and Griffin intentionally deceived Janel's officers into believing that it would have acquired the exclusive rights to all of the World Logistics intellectual property, computer software, source codes, trade names, brand names and, most importantly, its customer list and contacts.

31.     When Janel sent its personnel to the Greenville South Carolina office of World Logistics which was acquired pursuant to the Purchase Agreement , it found out that all of the World Logistics employees of that office, and the World Logistics customers of that office had been acquired by Cunningham since October Cunningham Settlement.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### AGAINST WORLD LOGISTICS, FRANCIS AND GRIFFIN
(§10(b) and Rule 10(b)(5) of the 1934 Act)

32.     Defendants World Logistics, Francis and Griffin misrepresented and omitted material facts, as described above, in connection with Defendants' acquisition of Janel securities by fraudulently inducing Plaintiffs' purchase of World Logistics assets.

33.     At the time Defendants World Logistics, Francis and Griffin made their misrepresentations and omissions to Plaintiffs, they knew or should have known that those misrepresentations were materially false and misleading and that the information omitted was material; they made those misrepresentations and omissions with the specific intent that

9

Plaintiffs reasonably rely upon them; Plaintiffs did, in fact, reasonably rely upon the statements; and were directly injured as a result.

34.    By reason of the foregoing, Plaintiffs have sustained damages in an amount to be determined at trial, but in excess of $1,000,000.00.

35.    Defendants World Logistics, Francis and Griffin knowingly violated §10(b) and Rule 10(b)(5) in connection with the fraud they perpetuated upon Plaintiffs involving Defendants acquisition of the Class B Shares of Janel in consideration for the Plaintiffs' purchase of World Logistics assets, therefore pursuant to 15 U.S.C. §78u-4(f)(2)(A), Defendants World Logistics, Francis and Griffin are liable for Plaintiffs' damages, as herein alleged.

## AS AND FOR A SECOND CLAIM FOR RELIEF
## AGAINST DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(§20(a) of the 1934 Act)

36.    Defendant World Logistics, by and through its senior executives and principals, were able to and did control, directly or indirectly, the statements and actions of Defendants World Logistics, Francis and Griffin in connection with the fraud they perpetrated involving Plaintiffs' purchase of World Logistics assets.

37.    With knowledge of the falsity of the statements and actions by World Logistics, Francis and Griffin contained herein, and/or in reckless disregard of such statements and actions by Defendants World Logistics, Francis and Griffin to Plaintiffs, World Logistics, Francis and Griffin caused or controlled the misstatements and omissions of material facts as alleged herein and therefore, pursuant to §20(a) of 15 U.S.C.§78t(a), World Logistics, Francis and Griffin are jointly and severally liable for Plaintiffs' damages, as herein alleged.

10

## AS AND FOR A THIRD CLAIM FOR RELIEF
## AGAINST DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(Common Law Fraud)

38.     As a result of Defendants World Logistics, Francis and Griffin fraud and materially misleading statements knowingly and intentionally made to Plaintiffs in connection with inducing Plaintiffs to issue Class B Shares of Janel to the Defendants, Defendants World Logistics, Francis and Griffin committed common law fraud, and are therefore jointly and severally liable for Plaintiffs' damages proximately caused thereby as herein alleged.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(Conversion)

39.     The Defendants wrongfully exercised dominion and control over Plaintiffs' property, and otherwise unlawfully converted for their own use and benefit the Class B Shares of Janel and monies which belonged to Plaintiffs, and which Defendants fraudulently induced Plaintiffs to deliver to them, all to Plaintiffs' detriment.

40.     Plaintiffs are informed and believe, and thereon allege, that the acts of these Defendants alleged herein were done willfully, maliciously and intentionally, with a willful and conscious disregard of Plaintiffs' rights, and with the specific intent to defraud Plaintiffs.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(Unjust Enrichment)

41.     Defendants unjustly enriched themselves by defrauding Plaintiffs in connection with the Plaintiffs purchase of World Logistics assets, and by fraudulently inducing them to transfer Class B Shares of Janel and money to, and for the benefit of, the Defendants.

42.     Under the circumstances, it would be manifestly unjust and inequitable for these

11

Defendants to profit as a result of Plaintiffs' losses in connection with the Defendants acts, practices and courses of conduct regarding the transactions described in this Complaint, and this court should enter an order and judgment cancelling the Class B Shares issued to the Defendants and, assessing damages against the Defendants together with with interest.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
### AGAINST DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(Breach of Covenant of Good Faith & Fair Dealing)

43.    Plaintiffs entered into the Purchase Agreement with World Logistics, whereby World Logistics, Francis and Griffin undertook the obligation to act in good faith and deal fairly with the Plaintiffs in connection with the above-described transactions.

44.    By reason of the acts, practices and courses of conduct set forth above, including without limitation the misrepresentations and omissions of material facts concerning World Logistics and the Cunningham Settlement, World Logistics, Francis and Griffin breached their duty of good faith and fair dealing and are thus liable to the Plaintiffs for money damages and cancellation of Class B Shares of Janel in amounts to be proved at trial, but no less than $1,000,000 and 181,500 Class B Shares of Janel.

### AS AND FOR AN SEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANTS WORLD LOGISTICS, FRANCIS AND GRIFFIN
(Punitive Damages)

45.    Plaintiffs are informed and believe, and thereon allege, that the acts, practices and courses of conduct of the Defendants alleged herein in Plaintiffs' First, Second, Third, Fourth and Fifth claims for relief were done willfully, maliciously and intentionally, with a willful and conscious disregard of Plaintiffs' rights, and with the specific intent to defraud Plaintiffs. Plaintiffs are therefore entitled to punitive damages according to proof at trial.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

A.      On the First, Second, Third, Fourth, Fifth and Sixth Claims for Relief, damages comprised of money damages and cancellation of Class B Shares of Janel in amounts to be proved at trial, but no less than $1,000,000 and 181,500 Class B Shares of Janel, together with interest running from the date of the first fraudulent act by the Defendants;

B.      On the Seventh Claim for Relief, punitive damages in an amount to be determined at trial; and

C.      On all Claims for Relief, an award in Plaintiffs' favor of all of the costs and expenses incurred by them in their prosecution of this action including, but not limited to, their reasonable attorneys' fees, together with such further and other relief as to this Court is just, fair and equitable.

## JURY DEMAND

Defendants hereby demand a trial by jury on all issues of fact.

Dated: New York, New York
       February 8, 2008

Yours, etc.

SCHEICHET & DAVIS, P.C.
Attorneys for Plaintiffs

By: _____
William J. Davis (WD-0362)
767 Third Avenue - 24th Floor
New York, New York 10017
(212) 688-3200

13