William J. Davis (WD 0362)
SCHEICHET & DAVIS, P.C.
Attorneys for Plaintiffs
767 Third Avenue, 24th Floor
New York, New York 10017
(212) 688-3200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                                          :
JANEL WORLD TRADE, LTD., and ORDER
LOGISTICS, INC.,                                          :        08-cv-01327 (RJS)

                                   Plaintiffs,            :

                    -vs-                                            ECF Case
                                                          :
WORLD LOGISTICS SERVICES, INC., RICHARD S.
FRANCIS, and BRIAN P. GRIFFIN,                            :

                                   Defendants.            :
------------------------------------------------------------------------x

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION OF DEFENDANT RICHARD FRANCIS TO DISMISS THE PLAINTIFFS' COMPLAINT

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ............................................................................................... i

**PRELIMINARY STATEMENT** .................................................................................... 1

**STANDARD OF REVIEW** .............................................................................................. 2

**ARGUMENT: FEDERAL CAUSES OF ACTION** ....................................................... 2

    1. The Plaintiffs Federal Causes of Action Should Not Be Dismissed because the
Complaint Adequately Alleges "Loss Causation" and "Transaction Causation" as
Defined by Case Law and Statutes. ................................................................................... 2

        A. Loss Causation ..................................................................................................... 3

        B. Transaction Causation ......................................................................................... 6

        C. Economic Loss .................................................................................................... 6

    2.      The Requite Element of Scienter as Articulated by the PSLRA and the Second
Circuit Has Been Clearly Alleged. ................................................................................... 7

    3. Plaintiffs' Complaint Should Not be Dismissed as a Matter of Law Because There
Were Misrepresentations and Omissions Made "In Connection With" the Purchase and
Sale of the Securities.......................................................................................................... 8

**ARGUMENT: STATE LAW CAUSES OF ACTION** ............................................... 10

    1.    The Court Should Not Dismiss Plaintiffs' Cause of Action in Conversion Because
Defendant's Exercised the Requisite "Dominion and Control" over Plaintiffs'
Property............................................................................................................................. 10

    2.    Defendants unjustly enriched themselves by defrauding Plaintiffs in connection
with the Plaintiffs purchase of World Logistics. .......................................................... 11

**CONCLUSION** ............................................................................................................. 12

## TABLE OF AUTHORITIES

**Cases**

*A.T. Brod & Co. v. Perlow*, 375 F. 2d 393 (2d Cir. 1967)............................................ 8, 10

*Bazak Int'l Corp. v Tarrant Apparel Group*, 347 F. Supp. 2d 1 (S.D.N.Y. 2004) ........... 11

*Chemical Bank v. Arthur Anderson & Co.*, 726 F. 2d 930 (2d Cir. 1984) .................... 8, 9

*Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899 (S.D.N.Y. 1990)...................................... 9

*Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957) ......................................................... 2

*Cooper v. Parsky,* 140 F.3d 433 (2d Cir.1998).................................................................. 2

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S. Ct. 1627 (2005) ............. 3, 4

*Golden Pacific Bancorp v. Federal Deposit Ins. Corp.,* 273 F.3d 509 (2d Cir.2001)...... 11

*In re Interpublic Securities Litigation*, 2003 WL 21250682, 10 (S.D.N.Y. 2003)............. 7

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F. 3d 161 (2d Cir. 2005) .............................. 2, 5

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006).......................................... 6

*Pail v. Precise Imports Co.,* 1999 WL 681384 1 ............................................................. 7

*S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38 (2d Cir. 1986) ................................... 8, 9

*State of New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 746 N.Y.S. 2d 637 (2d

  Cir. 2002) ................................................................................................ 10

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F. 3d 87 (2d Cir. 2001)........ 2

*Superintendent of Ins. of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92

  S.Ct. 165 (1971)........................................................................................ 8

*Pease v Smith*, 61 NY 477 (1875)................................................................................... 10

*Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.,* 87 NY2d 36 (1995).. 10

*Weiss v. Wittcoff*, 966 F. 2d 109 (2d Cir. 1992)............................................................... 6

*Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555 (2d Cir. 1985)................ 7

**Statutes and Rules:**

F.R.C.P. 9(b)……………………………………………………………………………1

F.R.C.P. 12(b)6 …………………………………………………………………………...1

17 C.F.R. § 240.10b-5; Rule 10b-5 …………………………………….........1, 2, 3, 4, 6, 8

## PRELIMINARY STATEMENT

Plaintiffs Janel World Trade, Ltd. and Order Logistics, Inc. submit this memorandum of law in opposition of the Defendant Richard Francis' motion to dismiss the Complaint. The Complaint sufficiently states claims pursuant to F.R.C.P. 12(b)(6) and pleads federal fraud claims with requisite particularity pursuant to F.R.C.P. 9(b). The elements of loss causation, transactional causation and scienter have been pleaded with requisite specificity. A cause of action "in connection with the purchase and sale of a security" under §10b and Rule 10(b)(5) claims have also been sufficiently alleged. All state law claims are adequately pleaded. The Complaint clearly states the allegations setting forth the time, place and contents of the misrepresentation and omissions made by the Defendants, including Mr. Francis.

## PRELIMINARY STATEMENT

This action arose out of the Defendants fraudulent activities and material contract breaches by which they deceived the Plaintiffs into purchasing "exclusive" rights to certain assets when, in fact, Defendants had compromised the exclusivity by having secretly granted rights to use or exploit those assets to a third-party creditor of World Logistics. The Defendants knew that disclosure of the grant of rights would result in the Plaintiffs refusing to go forward with the asset acquisition transaction. Annexed as Exhibit "1" is a copy of an email exchange between Defendants Francis and Griffin on September 30, 2007, in which Francis sent the draft grant of rights to Griffin for review, and Griffin responded that "…Janel will never allow him (i.e. the third-party) to use the eBridge brand and compete with us (they have been very focused on this proprietary software issue)." The terms of the grant of rights were never disclosed to the Plaintiffs by the Defendants.

The asset acquisition transaction was completed, shares of Janel's convertible preferred stock were issued, and Janel made payments of more than $2,300,000 to Defendants and their creditors. Plaintiffs did not discover the terms of the grant of rights until months after the transaction, when they received a copy of the grant of rights from the third-party.

## STANDARD OF REVIEW

In ruling on a motion to dismiss, the Court must accept as true all well-pleaded assertions of fact alleged in the complaint. See _Cooper v. Parsky,_ 140 F.3d 433, 440 (2d Cir. 1998).

> The Court may not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson,_ 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (internal quotations omitted).

In deciding a motion to dismiss, the Court determines the legal feasibility of the complaint, but does not weigh the sufficiency of the evidence or resolve the merits of any issues that may be presented. _See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,_ 748 F.2d 774, 779 (2d Cir.1984); _Geisler v. Petrocelli,_ 616 F.2d 636, 639 (2d Cir.1980).

## ARGUMENT: FEDERAL CAUSES OF ACTION

1. The Plaintiffs Federal Causes of Action Should Not Be Dismissed because the Complaint Adequately Alleges "Loss Causation" and "Transaction Causation" as Defined by Case Law and Statutes.

To state a claim for relief under Section 10(b) and Rule 10b-5, plaintiffs must allege the Defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase and sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiffs' reliance was the proximate cause of their injury. _Lentell v. Merrill Lynch &Co., Inc._, 396 F.3d 161, 172 (2d Cir. 2005). The causation element of Rule 10b-5 has two separate elements: "a plaintiff must allege both transaction causation…and loss causation…." _Suez Equity Investors, L.P. v. Toronto Dominion Bank_, 250 F. 3d 87, 95 (2d Cir. 2001).

Transaction causation requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities. *Id.* Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. Plaintiff ultimately suffered as a direct result of the Defendants' misrepresentation. *Id.* Here, Plaintiffs would not have given up rights to the Janel securities as part of the consideration, if the Defendant had not represented to Plaintiffs that in exchange for the securities, Plaintiffs would be acquiring exclusive rights to all of the World Logistics intellectual property, computer software, source codes, trade names, brand names, and its customer list and contacts. Such misrepresentation was a direct cause of the Plaintiffs' loss.

A. Loss Causation

Defendant Francis relies on *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S. Ct. 1627 (2005) to argue that the Complaint fails to allege several of the necessary elements required by federal law.

*Dura* is factually distinguishable from the case at hand. Unlike our case, *Dura* deals with inflated purchase price of stocks, or fraud on the market. *Id.* In *Dura*, plaintiffs brought suit against a pharmaceuticals manufacturer alleging that they bought stocks from the defendant corporation at artificially inflated prices through false statements which implied that the Food and Drug Administration was going to approve a new product that was developed by the pharmaceutical company. *Id.* at 1630. The issue was whether an allegation of an inflated purchase price on the date of purchase, in and of itself, was sufficient to meet that burden of loss causation under Rule 10b-5 and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). *Id.* at 1629. The Supreme Court held that a plaintiff who alleges that he or she purchased a security at an inflated price and suffered a loss on that purchase at some point in the

future has not alleged that the loss was actually caused by the defendant's misrepresentation. *Id.* The Supreme Court merely stated that in cases involving fraud on the market, the sole allegation that plaintiff bought stocks at an inflated price without more is not enough to bring a §10b and Rule 10(b)(5) claim in the Ninth Circuit. *Id.* at 1630. The *Dura* ruling is not relevant to the present case because Plaintiffs are not asserting a sale or purchase of securities at an inflated price or fraud on the market.

Nonetheless, *Dura* stands for the proposition that a plaintiff must do more than allege purchase price inflation. *Id.* A plaintiff must plead actual economic loss and proximate causation. *Id. at 1634.* Such economic loss and causation have been adequately pleaded in this Complaint. In addition, the Supreme Court's opinion in *Dura* emphasized that it does not modify the pleading requirements of Fed. R. Civ. 8 (a) (2), which merely requires a plaintiff to provide a short and plain statement of the claim showing that the pleader is entitled to relief. *Id.* at 1634.

The Supreme Court explained that pleadings are intended to provide a defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Id.* The Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*

> …[I]t should not prove burdensome for a plaintiff suffering economic loss  to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346

Plaintiff's Complaint has done precisely what the rules, statute and case law require. The statute does not set out a requirement that the plaintiff be the purchaser of stock, or that there be fraud on the market, for such claims to survive.

The Court of Appeals explained in *Lentell v. Merrill Lynch & Co., Inc*., 396 F. 3d 161, 173 (2d Cir. 2005), that to establish loss causation, "a plaintiff must allege…that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."

The court in *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006) divided this element into a two step analysis. First,

> …in analyzing whether a complaint alleging securities fraud adequately pleads loss causation is to identify the subject of the misrepresentation or omission that allegedly caused plaintiff's loss, i.e. the risk concealed by defendant's fraud. *Id.*

Here, the subject of the fraudulent statement was the Defendants' reassurance and promise that Plaintiffs would be receiving exclusive rights to the Defendants intellectual property, and the risk was that the exclusivity had been compromised. The second step is "…to determine whether the complaint alleges that the concealed risk led to plaintiff's loss." *Id.* "If that relationship is sufficiently direct, loss causation is established…" *Leykin*, 423 F. Supp. at 240, quoting *Lentell*, 396 F. 3d at 174.

Here, the concealment of non-exclusive rights resulted in Plaintiffs being defrauded into paying more than $2,300,000 of the Defendants debts, and issuing shares of its Class B Convertible Preferred Stock. For example, in the six month period ending on March 31, 2007, the plaintiff-corporation had a net income of $85,883. In the same period the following year, the corporation had a loss of $(148,271). In the three months ending in March 31, 2007, the corporation had an income of $33,685. In the same period the following year, the corporation had a net loss of $(166,570). See Janel World Trade Ltd. and Subsidiaries Consolidated Statements of Income, attached hereto as Exhibit 2. The Plaintiffs have suffered losses even if the value of its stock has risen. Loss causation is sufficiently pleaded.

Moreover, in *Weiss v. Wittcoff*, 966 F. 2d 109, 111 (2d Cir. 1992), the court held that the facts alleged in the complaint adequately pleaded loss causation where the Plaintiff alleged that he transferred stock to the Defendant in reliance of the Defendant's misrepresentations concerning their future actions. Likewise, the Complaint in this case specifically states that the Defendants made misrepresentations and omissions with the specific intent that Plaintiffs rely upon them; Plaintiffs did, in fact, reasonably rely upon the statements, and were directly injured as a result. See Complaint ¶33. Thus, Plaintiffs' loss of the shares of its Class B Convertible Preferred Stock was clearly a result of their reliance on the Defendant's misrepresentation, since defendant's "…failure to fulfill the promises foreseeably caused" financial loss to Plaintiffs. *Id.* at 111.

B. Transaction Causation

Transaction causation requires that, but for the defendants misrepresentations, the plaintiffs would not have engaged in the transaction. *Weiss*, 966 F. 2d at 111. Clearly, such is the case here. The email exchange between Defendants Francis and Griffin on September 30, 2007 demonstrated this "but-for" causation. When Francis sent the draft grant of rights to Griffin for review, and Griffin responded that:

> …Janel will never allow him (i.e. the third party) to use the eBridge brand and compete with us (they have been very focused on this proprietary software issue). See email attached hereto as Exhibit "1".

The Complaint alleges that the Defendants knew that "but for" the exclusive rights to World Logistics intellectual property, Plaintiffs would have never signed the Asset Purchase Agreement. See Complaint ¶ 11- 13 and 32- 35.

C. Economic Loss

Defendant Francis claims that Plaintiffs suffered "…no loss within Rule 10b-5 unless such shares were actually issued and transferred." The fact that no shares were delivered does not defeat Plaintiffs claims because "…neither the [Securities Exchange] Act nor Rule 10b-5 expresses any requirement that the stock actually have been issued." *Pail v. Precise Imports Co.,* 1999 WL 681384 1, 4. "A contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 559 (2d Cir. 1985). Thus, it is irrelevant that under the terms of the underlying "Purchase Agreement," Defendant Francis is unable to convert any of the Class B Convertible Preferred Stock until two years after issuance.

2.   The Requite Element of Scienter as Articulated by the PSLRA and the Second Circuit Has Been Clearly Alleged.

The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Interpublic Securities Litigation*, 2003 WL 21250682, 10 (SDNY 2003) (internal quotations omitted).

The Second Circuit has identified four types of allegations that may support a strong inference of scienter:

[W]here the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *In re Interpublic Securities Litigation*, 2003 WL 21250682, 10 (S.D.N.Y. 2003).

The Complaint clearly states that Defendants made false and misleading statements and omitted material information with the knowledge that if they had not misrepresented or omitted pertinent information, Plaintiffs would not go for the "Purchase Agreement." See Complaint ¶19-31. The Complaint alleges that this material information was knowingly and intentionally hidden

from Janel and its representatives prior to the signing and closing of the Purchase Agreement, which constitutes an intentional violation of the material terms of the Purchase Agreement. See Complaint ¶ 28. Thus, the element of scienter has been sufficiently alleged in Plaintiffs' Complaint.

3. Plaintiffs' Complaint Should Not be Dismissed as a Matter of Law Because There Were Misrepresentations and Omissions Made "In Connection With" the Purchase and Sale of the Securities.

The Defendant's narrow reading of the "in connection with" requirement cannot be reconciled with the broad construction of the nexus requirement as articulated by the Supreme Court in *Superintendent of Ins. of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), as well as Second Circuit cases. See *S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38, 42 (2d Cir. 1986), cert. denied, 476 U.S. 1171, 106 S.Ct. 2894 (1986); *A.T. Brod & Co. v. Perlow*, 375 F. 2d 393 (2d Cir. 1967).

> We believe that §10b and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Superintendent of Ins. of New York*, supra, 404 U.S. at 11. "…[S]ince there was a 'sale' of a security and since fraud was used 'in connection' with it, there is redress under §10b… *Id.* at 12.

The Supreme Court explained that:

> When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of informed judgment on the part of its board regarding the merits of the transaction. In this situation, the private right of action recognized under Rule 10b-5 is available as a remedy for the corporate disability. *Id.* at 13.

Section 10b should be readily available as a remedy in this action, because when Defendants failed to disclose that the exclusive rights had been compromised, Plaintiffs were disabled from availing themselves of informed judgment regarding the merits of the transaction.

The Second Circuit follows this broad reading of the statute. The Defendants base their argument on a narrow reading of the statute, primarily focused upon *Chemical Bank v. Arthur Anderson & Co.*, 726 F. 2d 930 (2d Cir. 1984) and *Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899 (S.D.N.Y. 1990), which followed the holding in *Chemical Bank*.

These cases differ factually from ours. In *Chemical Bank*, securities were merely pledged as collateral, whereas in this case, Defendants were acquiring shares of Plaintiffs' convertible preferred stock. Here, Defendants fraudulently acquired the securities, as opposed to *Chemical Bank*, where there was no acquisition of the security.

In *S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38, 42 (2d Cir. 1986), the court analyzed and distinguished itself from *Chemical Bank*. The *Drysdale* court held that alleged misrepresentations made with respect to a company's financial condition were in connection with a purchase and sale of securities for the purpose of statutes prohibiting fraud in connection with a purchase or sale of securities. *Id.* One deciding factor for the court was that in *Chemical Bank*, the lender merely held collateral for security, and never took title to securities. *Id.* at 41.

This case regards a transaction "…where the securities were transferred as a direct result of a misrepresentation." *Drysdale,* 785 F. 2d at 43. Plaintiffs exchanged securities for exclusive rights to assets. No such exclusivity existed, and that knowledge was denied to the Plaintiffs.

The District Court in *Citibank*, relying on *Chemical Bank*, held that a last minute substitution of a promissory note for cash as consideration for stock was not sufficiently related to the nature or value of the stock. This narrow holding is inconsistent with the Second Circuit's decision in *Drysdale*, which held that the "in connection with" requirement was satisfied where defendants allegedly misrepresented their financial condition to banks and securities dealers. *Id.* at 42. *Drysdale* found that:

"…misrepresentation clearly pertained to a significant part of the consideration offered…," and that the allegedly fraudulent warranty as to the solvency of the defendant company "…was essential to the value of received by the other party in a securities transaction." *Drysdale*, 785 F. 2d at 42.

In <u>*A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir.1967)</u>, the court held that a §10(b) claim was stated by Plaintiff's allegation of defendant's scheme to purchase securities with a fraudulent intent to pay only if their market value had increased by the date payment was due. The court stated that "[n]either §10(b) nor Rule 10(b)(5) contains any language which would indicate that those provisions were intended to deal only with fraud as to the "investment value" of the securities and indeed it is established that a 10(b)(5) action will survive even though the fraudulent scheme or device is unrelated to the 'investment value.'" *Id.* at 396-7.

Accordingly, this Court should find that although the misrepresentations did not concern the value of the securities themselves, there is enough for a §10(b) claim because securities were traded as a direct result of the misrepresentation.

## ARGUMENT: STATE LAW CAUSES OF ACTION

1. <u>The Court Should Not Dismiss Plaintiffs' Cause of Action in Conversion Because Defendant's Exercised the Requisite "Dominion and Control" over Plaintiffs' Property.</u>

Defendant argues that the conversion claim should be dismissed because Janel had not tendered or transferred the Class B Convertible Preferred Stock to defendant Francis is contrary to the rulings in this Circuit. The Court in *State of New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S. 2d 637, 646 (2d Cir. 2002) iterated that "[t]o be sure, the wrongful exercise of dominion need not consist of a "manual taking, on the defendants' part." The Court of Appeals stated that the act of interference may leave the goods physically undisturbed, yet still impair the owner's rights. See also <u>*Pease v Smith*, 61 NY 477, 481 (1875).</u> "Courts that state that manual taking is unnecessary do so in order to protect the rights of owners distressed by real, yet intangible, transgressions. *Id.* See also <u>*Vigilant Ins. Co. of Am. v Housing*</u>

_Auth. of City of El Paso, Tex.,_ 87 NY2d 36, 43 (1995). Thus, although Francis may not have yet received any of the Series B Convertible Preferred Stock, he has undoubtedly impaired Janel's rights and thus the claim for conversion should not be dismissed.

2. Defendants unjustly enriched themselves by defrauding Plaintiffs in connection with the Plaintiffs purchase of World Logistics.

To state a claim of unjust enrichment under New York law, the plaintiff must allege:

(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or [benefit] to the plaintiff. _Golden Pacific Bancorp v. Federal Deposit Ins. Corp.,_ 273 F.3d 509, 519 (2d Cir.2001).

The court in _Bazak Int'l Corp. v Tarrant Apparel Group_, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) stated that a plaintiff may simultaneously allege breach of contract and unjust enrichment in its claim. "A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff." _Id._ at 4. The Complaint alleges that Defendants unjustly received something of value, namely the Class B Shares issued to the Defendants. While an unjust enrichment claim ordinarily is precluded when there is a valid and enforceable contract, Id. at 4, the validity of the contract is at issue, where Defendant perpetrated fraud on the Plaintiffs in order that they enter into a contract with the Defendants.

## <u>CONCLUSION</u>

It is for these reasons that there is no sound basis for a dismissal of the Plaintiffs' Complaint. The motion of the moving Defendants Griffin and Francis should be denied

Dated: New York, New York
        June 13, 2008

                                        Respectfully submitted,

                                        SCHEICHET & DAVIS, P.C.

                                By:    s/_____
                                        William J. Davis (WD 0362)
                                        767 Third Avenue, 24th Floor
                                        New York, NY  10017
                                        (212) 688-3200

Of Counsel:

Khine Aung, Esq.

-----Original Message-----

From:  briangriffin@orderlogistics.com
Subj:  Re: FW: Special Request - draft agreement attached [mx]
Date:  Sun Sep 30, 2007 2:01 pm
Size:  1K
To:    "Richard Francis" <Rich@balrrexp.com>

FYI - I will review but Janel will never allow him to use the eBridge brand and compete with us
(they have been very focused on this proprietary software  issue).

-----Original Message-----

From:  "Richard Francis" <Rich@balrrexp.com>
Subj:  FW: Special Request - draft agreement attached [mx]
Date:  Sun Sep 30, 2007 11:52 am
Size:  1K
To:    <BrianGriffin@OrderLogistics.com>

    Brian, please review and see if there is anything here we  can work with. Does Order
Logistics still market under the eBridge brand?  Also, we can adjust shares and so on. Just see if
it's in anyway worth  talking about. He wants the right to compete and use that name.  Don't let
it bother you. I haven't promised anything more than I would  throw it on the table. Thanks for
the updates this weekend. I think  we're close. I have 1st Nat of SC standing by to write the note
to Janel  and to release us. Boswell is reading to sign also. We need  Gayle. If you can find his
attorney's name let me know. Thanks  again.

    From: Braddock Cunningham  [mailto:bcunningham@braddockonline.com]
Sent: Saturday, September 29,  2007 11:30 AM
To: Richard Francis
Subject: RE: Special  Request - draft agreement attached [mx]

Rich,
Here is a draft agreement that we can work with

Braddock G  Cunningham   --- message truncated ---

EXHIBIT No. 1

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-Q

X.   QUARTERLY REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For the quarterly period ended: **March 31, 2008**

___   TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES
EXCHANGE ACT OF 1934

**Commission File No. 333-60608**

# JANEL WORLD TRADE, LTD.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEVADA** | **86-1005291** |
| (State of incorporation) | (I.R.S. Employer Identification Number) |
| **150-14 132nd Avenue, Jamaica, NY** | **11434** |
| (Address of principal executive offices) | (Zip Code) |

**(718) 527-3800**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes _X_   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "large accelerated filer" and "accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer [    ]        Accelerated filer [    ]        Non-Accelerated filer [X]

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).                                                                 Yes   No _X_

State the number of shares outstanding of each of the issuer's class of common equity, as of the latest practicable date: 16,977,188.

**EXHIBIT No. 2**

## PART I - FINANCIAL INFORMATION

**Item 1.  Financial Statements.**

(a)  Janel's unaudited, interim financial statements for its second fiscal quarter (the three and six months ended March 31, 2008) have been set forth below. Management's Discussion and Analysis of the Company's Financial Condition and the Results of Operations for the second fiscal quarter will be found at Item 2, following the financial statements.

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Forward Looking Statements**

The statements contained in all parts of this document that are not historical facts are, or may be deemed to be, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements include, but are not limited to, those relating to the following: the effect and benefits of the Company's reverse merger transaction; Janel's plans to reduce costs (including the scope, timing, impact and effects thereof); potential annualized cost savings; plans for direct entry into the trucking and warehouse distribution business (including the scope, timing, impact and effects thereof); the Company's ability to improve its cost structure; plans for opening additional domestic and foreign branch offices (including the scope, timing, impact and effects thereof); the sensitivity of demand for the Company's services to domestic and global economic and political conditions; expected growth; future operating expenses; future margins; fluctuations in currency valuations; fluctuations in interest rates; future acquisitions and any effects, benefits, results, terms or other aspects of such acquisitions; ability to continue growth and implement growth and business strategy; the ability of expected sources of liquidity to support working capital and capital expenditure requirements; future expectations and outlook and any other statements regarding future growth, cash needs, operations, business plans and financial results and any other statements that are not historical facts.

When used in this document, the words "anticipate," "estimate," "expect," "may," "plans," "project," and similar expressions are intended to be among the statements that identify forward-looking statements. Janel's results may differ significantly from the results discussed in the forward-looking statements. Such statements involve risks and uncertainties, including, but not limited to, those relating to costs, delays and difficulties related to the Company's dependence on its ability to attract and retain skilled managers and other personnel; the intense competition within the freight industry; the uncertainty of the Company's ability to manage and continue its growth and implement its business strategy; the Company's dependence on the availability of cargo space to serve its customers; effects of regulation; its vulnerability to general economic conditions and dependence on its principal customers; accuracy of accounting and other estimates; risk of international operations; risks relating to acquisitions; the Company's future financial and operating results, cash needs and demand for its services; and the Company's ability to maintain and comply with permits and licenses; as well as other risk factors described in Janel's Annual Report on Form 10-K filed with the SEC on January 15, 2008. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes may vary materially from those projected.

**Overview**

The following discussion and analysis addresses the results of operations for the three and six months ended March 31, 2008, as compared to the results of operations for the three and six months ended March 31, 2007. The discussion and analysis then addresses the liquidity and financial condition of the Company, and other matters.

**Results of Operations**

Janel operates its business as two reportable segments comprised of: 1) full-service cargo transportation logistics management, including freight forwarding – via air, ocean and land-based carriers – customs brokerage services, warehousing and distribution services, and other value-added logistics services, and 2) computer software sales, support and maintenance.

**Three Months Ended March 31, 2008 Compared to Three Months Ended March 31, 2007**

**Revenue.** Revenue for the second quarter of fiscal 2008 was $18,281,961, as compared to $18,303,590 for the same period of fiscal 2007, a year-over-year decrease of $(21,629), or (0.1)%. For the three months of fiscal 2008, transportation logistics accounted for revenue of $18,219,061, while computer software revenue was $62,900, generated during the quarter from the Company's October 18, 2007 acquisition of certain assets of World Logistics, Inc. (formerly named "Order Logistics Inc"). There was no comparable computer software-related revenue in the fiscal 2007 period. The essentially flat level of transportation logistics revenue reflected the relative equality of overall shipping activity by existing customers between the two periods. Computer software-related revenue during the period was negatively affected as the Company closed former World Logistics operations in South Carolina, which were then consolidated into the Company's Chicago operations.

**Forwarding Expense.** Forwarding expense is primarily comprised of the fees paid by Janel directly to cargo carriers to handle and transport its actual freight shipments on behalf of its customers between initial and final terminal points. Forwarding expense also includes any duties and/or trucking charges related to the shipments. As a general rule, revenue received by the Company for shipments via ocean freight are marked up at a lower percentage versus their related forwarding expense than are shipments via airfreight, i.e., forwarding expense as a percentage of revenue is generally higher (and the Company earns less) for ocean freight than for airfreight.

For the second quarter of fiscal 2008, forwarding expense decreased by $405,347, or 2.5%, to $15,934,980, as compared to $16,340,327 for the second quarter of fiscal 2007. The percentage decrease in forwarding expense was greater than the percentage decrease in transportation logistics revenue, down 0.5%, year-over-year, yielding a favorable decline of 2.1 percentage points in the measure of forwarding expense as a percentage of revenue to 87.2% in the second quarter of fiscal 2008, from 89.3% for the second fiscal quarter of 2007. This is principally the result of increased average margins earned by the Company on ocean freight shipments in the fiscal 2008 quarter, which also accounted for a higher proportion of the quarter's shipping activity.

**Selling, General and Administrative Expense.** Selling, general and administrative expense in second quarter of fiscal 2008 increased by $455,521, or 23.8%, to $2,366,265, as compared to $1,910,744 in the second quarter of fiscal 2007. The year-over-year dollar increase in SG&A primarily resulted from the additional expenses related to additional employees added to the Company's payroll during the fiscal 2008 first quarter as a result of its asset acquisition

during that period. SG&A as a percentage of revenue increased by 250 basis points from 10.44% in the second quarter of fiscal 2007, to 12.94% in the second quarter of fiscal 2008.

**Income (Loss) Before Taxes.** Janel's results fell from an income before taxes of $64,018 in the second quarter of fiscal 2007 to a loss before taxes of $(198,920) in the second quarter of fiscal 2008. Second quarter 2008 charges of $161,813 related to amortization of intangible assets and $10,797 related to increased depreciation, both pertaining essentially to the Company's asset acquisition in October 2007, and incremental interest expense during the fiscal 2008 second quarter of $29,343, pertaining principally to acquisition financing, (see Note 2 to financial statements), more than accounted for the reported quarterly pretax loss.

**Income Taxes.** The effective income tax rate in both the 2008 and 2007 fiscal periods reflects the U.S. federal statutory rate and applicable state income taxes.

**Net Income.** Net loss available to common shareholders for the second quarter of fiscal 2008 was $(166,570), or $(0.0096) per fully diluted share, as compared to net income available to common shareholders of $33,685, or $0.005 per fully diluted share, in the second quarter of fiscal 2007. The same principal factors as described above for the second fiscal quarter 2008 loss before taxes contributed to the period's net loss.

### Six Months Ended March 31, 2008 Compared to Six Months Ended March 31, 2007

**Revenue.** Revenue for the six months ended March 31, 2008 was $38,349,307, as compared to $35,031,459 for the same period of fiscal 2007, a year-over-year increase of $3,317,848, or 9.5%. The higher level of revenue primarily reflected a net year-over-year rise in shipping activity by existing customers as the generally weaker dollar has hampered the level of imports to a greater extent than it has benefited exports. For the six months of 2008, transportation logistics accounted for revenue of $38,031,108, while computer software revenue was $318,199.

**Forwarding Expense.** For the six months ended March 31, 2008, forwarding expense was $33,483,443, as compared to $31,144,581 for the same period of fiscal 2007, a year-over-year increase of $2,338,862, or 7.5%. The percentage increase was somewhat less than the increase in transportation logistics revenue, up 8.6%, for the six months ended March 31, 2008 as compared to fiscal 2007, resulting in forwarding expense as a percentage of revenue declining marginally to 87.3% as compared to the year-earlier 88.9%, an improvement of 1.6 percentage points. This is principally the result of increased average margins earned by the Company on ocean freight shipments in the fiscal 2008 six months, which also accounted for a higher proportion of the half's shipping activity.

**Selling, General and Administrative Expense.** For the six-month periods ended March 31, 2008 and 2007, selling, general and administrative expenses were $4,666,805 (12.17% of revenue) and $3,754,920 (10.72%), respectively. This represents a year-over-year increase of $911,885, or 24.3%. The year-over-year dollar increase in SG&A resulted from a additional expenses related to additional employees added to the Company's payroll during the fiscal 2008 first half as a result of its asset acquisition in October 2007.

**Income (Loss) Before Taxes.** Janel reported a loss before taxes of $(158,771) for the six months ended March 31, 2008 as compared to income before taxes of $156,216 for the six months ended March 31, 2007. First half 2008 charges of $323,625 related to amortization of intangible assets and $26,043 related to increased depreciation, both pertaining essentially to the Company's asset acquisition in October 2007, and incremental interest expense during the 2008 first half of $62,797, pertaining principally to acquisition financing, (see Note 2 to financial statements), accounted for significantly more than the reported six-months pretax loss.

**Income Taxes.** The effective income tax rate in both the 2008 and 2007 fiscal periods reflects the U.S. federal statutory rate and applicable state income taxes.

**Net Income.** Janel reported net loss available to common shareholders for the six months ended March 31, 2008 of $(148,271), or $(0.0086) per diluted share, down $234,154 as compared to a net income available to common shareholders of $85,883 or $0.005 per diluted share, for the six months ended March 31, 2007. The same principal factors as described above for the first half 2008 loss before taxes contributed to the period's net loss.

## Liquidity and Capital Resources

Janel's ability to meet its liquidity requirements, which include satisfying its debt obligations and funding working capital, day-to-day operating expenses and capital expenditures depends upon its future performance, and is subject to general economic conditions and other factors, some of which are beyond its control.

During the six months ended March 31, 2008, Janel's net working capital (current assets minus current liabilities) decreased by approximately $(1,902,086), or (44.4)%, reflecting an decrease in cash and cash equivalents of approximately $872,000, plus the addition of notes payable totaling $1,825,000, only partially offset by lower accounts payable of approximately $727,000. Janel's cash flow performance for the six months is not necessarily indicative of future cash flow performance.

In July 2005, Janel decreased its line of credit from $3,000,000 to $1,500,000, because cash flow had become adequate for financing its receivables, and because it obtained a reduced interest rate. During the first quarter of 2008, to help finance the Company's acquisition of certain assets of World Logistics, Inc., the Company borrowed $1,700,000 (including a temporary increase of $200,000) under this existing line of credit, while also issuing a note payable in the amount of $125,000. In addition, Janel entered into a term loan agreement with a different bank in the amount of $500,000 (see Note 2 to financial statements). At March 31, 2008, Janel had no remaining available borrowing under its line of credit. The outstanding balance of notes payable of $1,825,000 bears interest at prime less a three-quarters of one percent (0.75%) per annum and is collateralized by substantially all the assets of Janel and personal guarantees by certain shareholders of the Company. As of December 31, 2008, the Company had taken down the full $500,000 of available borrowing under its five-year term loan agreement, bearing interest at 7.25% per annum, collateralized by substantially all the assets of Janel and personal guarantees by certain shareholders of the Company. As a subsequent event, in April 2008, the outstanding bank note payable of $1,700,000 was converted into a term loan payable in monthly installments of $20,238 plus interest at the bank's prime rate plus 0.75% per

annum, or LIBOR plus 2% per annum. In addition, the bank gave the Company a new credit line of $1,500,000, which expires on March 31, 2009.

Management believes that anticipated cash flow is sufficient to meet its current working capital and operating needs. However, the Company is also proceeding with its comprehensive growth strategy for fiscal 2008 and beyond, which encompasses a number of potential elements, as discussed below under "Current Outlook." To successfully execute several of these growth strategy elements in the coming months, the Company may need to secure additional financing estimated at up to $10,000,000. There is no assurance that such additional capital as necessary to execute the Company's business plan and intended growth strategy will be available or, if available, will be extended to the Company at mutually acceptable terms.

**Current Outlook**

Janel is primarily engaged in the business of providing full-service cargo transportation logistics management, including freight forwarding via air, ocean and land-based carriers, customs brokerage services, warehousing and distribution services, and other value-added logistics services and in the business of computer software sales, support and maintenance. Its results of operations are affected by the general economic cycle, particularly as it influences global trade levels and specifically the import and export activities of Janel's various current and prospective customers.

Historically, the Company's quarterly results of operations have been subject to seasonal trends which have been the result of, or influenced by, numerous factors including climate, national holidays, consumer demand, economic conditions, the growth and diversification of its international network and service offerings, and other similar and subtle forces.

Management has been engaged in reviewing the profitability of various customer accounts with a view toward eliminating accounts which are only marginally profitable, and focusing on accounts that are more profitable, with a view to increasing its overall profit margin. Based upon the results for the six months ended March 31, 2008, and its current expectations for the remainder of fiscal 2008, Janel projects that gross revenue from its currently existing accounts and businesses for its fiscal year ending September 30, 2008, will grow by approximately 5-10% to approximately $78-$82 million.

Janel is continuing to implement its business plan and strategy to increase revenue and profitability through its fiscal year ending September 30, 2008 and beyond. The Company's strategy, some of which has been implemented, includes plans to: open additional branch offices both domestically and in Southeast Asia; increase profit margins by avoiding low-margin business; introduce additional revenue streams for its existing headquarters and branch locations; proceed with negotiations and due diligence with privately held transportation-related firms which may ultimately lead to their acquisition by the Company; expand its existing sales force by hiring additional commission-only sales representatives with established customer bases; increase its focus on growing revenue related to export activities; evaluate direct entry into the trucking and warehouse distribution business as a complement to the services already provided to existing customers; and continue its efforts to reduce current and prospective overhead and

operating expenses, particularly with regard to the efficient integration of any additional offices or acquisitions.

Certain elements of the Company's growth strategy, principally proposals for acquisition, are contingent upon the availability of adequate financing at terms acceptable to the Company. The Company is continuing in its efforts to secure long-term financing, but has to date been unable to complete any such financing transactions at terms it deems acceptable, and cannot presently anticipate when or if financing on acceptable terms will become available. Therefore, the implementation of significant aspects of the Company's strategic growth plan may be deferred beyond the originally anticipated timing.

## Critical Accounting Policies and Estimates

Management's Discussion and Analysis of Financial Condition and Results of Operations discusses the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Since future events and their effects cannot be determined with absolute certainty, the determination of estimates requires the exercise of judgment. Actual results could differ from those estimates, and such difference may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates as to the appropriate carrying value of certain assets and liabilities which are not readily apparent from other sources, primarily allowance for doubtful accounts, accruals for transportation and other direct costs, and accruals for cargo insurance. Management bases its estimates on historical experience and on various assumptions which are believed to be reasonable under the circumstances. We reevaluate these significant factors as facts and circumstances change. Historically, actual results have not differed significantly from our estimates. These accounting policies are described at relevant sections in this discussion and analysis and in the notes to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended September 30, 2007.

Management believes that the nature of the Company's business is such that there are few, if any, complex challenges in accounting for operations. Revenue recognition is considered the critical accounting policy due to the complexity of arranging and managing global logistics and supply-chain management transactions.

## Revenue Recognition

A. Full Service Cargo Transportation Logistics Management

Revenues are derived from airfreight, ocean freight and custom brokerage services. The Company is a non-asset-based carrier and accordingly does not own transportation assets. The Company generates the major portion of its air and ocean freight revenues by purchasing transportation services from direct carriers (airlines, steam ship lines, etc.) and reselling those services to its customers. By consolidating shipments from multiple customers and availing itself

of its buying power, the Company is able to negotiate favorable rates from the direct carriers, while offering to its customers lower rates than the customers could obtain themselves.

Airfreight revenues include the charges for carrying the shipments when the Company acts as a freight consolidator. Ocean freight revenues include the charges for carrying the shipments when the Company acts as a Non-Vessel Operating Common Carrier (NVOCC). In each case, the Company is acting as an indirect carrier. When acting as an indirect carrier, the Company will issue a House Airway Bill (HAWB) or a House Ocean Bill of Lading (HOBL) to customers as the contract of carriage. In turn, when the freight is physically tendered to a direct carrier, the Company receives a contract of carriage known as a Master Airway Bill for airfreight shipments and a Master Ocean Bill of Lading for ocean shipments. At this point the risk of loss passes to the carrier, however, in order to claim for any such loss, the customer is first obligated to pay the freight charges.

Based upon the terms in the contract of carriage, revenues related to shipments where the Company issues a HAWB or a HOBL are recognized at the time the freight is tendered to the direct carrier. Costs related to the shipments are recognized at the same time.

Revenues realized when the Company acts as an agent for the shipper and does not issue a HAWB or a HOBL include only the commission and fees earned for the services performed. These revenues are recognized upon completion of the services.

Customs brokerage and other services involve providing multiple services at destination including clearing shipments through customs by preparing required documentation, calculating and providing for payment of duties and other charges on behalf of the customers, arranging for any required inspections, and arranging for final delivery. These revenues are recognized upon completion of the services.

The movement of freight may require multiple services. In most instances the Company may perform multiple services including destination break-bulk and value added services such as local transportation, distribution services and logistics management. Each of these services has separate fee that is recognized as revenue upon completion of the service.

Customers will frequently request an all-inclusive rate for a set of services that is known in the industry as "door-to-door services." In these cases, the customer is billed a single rate for all services from pickup at origin to delivery. The allocation of revenue and expense among the components of services when provided under an all inclusive rate are done in an objective manner on a fair value basis in accordance with Emerging Issues Task Force (EITF) 00-21, "Revenue Arrangements with Multiple Deliverables."

B. Computer Software Sales, Support and Maintenance

The Company recognizes revenue, including multiple element arrangements, in accordance with the provisions of the SEC's Staff Accounting bulletin ("SAB") No. 104, *Revenue Recognition*, and the Financial Accounting Standards Board's ("FASB"), and EITF 00-21, *Revenue Agreements with Multiple Deliverables*. Revenue from the sale of the Company's

products and services are recognized when persuasive evidence of an arrangement exists, delivery has occurred (or services have been rendered), the price is fixed or determinable, and collectability is reasonably assured. Amounts billed in excess of revenue recognized are recorded as deferred revenue in the balance sheet.

**Estimates**

While judgments and estimates are a necessary component of any system of accounting, the Company's use of estimates is limited primarily to the following areas that in the aggregate are not a major component of the Company's consolidated statements of income:

a. accounts receivable valuation;
b. the useful lives of long-term assets;
c. the accrual of costs related to ancillary services the Company provides; and
d. accrual of tax expense on an interim basis.

Management believes that the methods utilized in all of these areas are non-aggressive in approach and consistent in application. Management believes that there are limited, if any, alternative accounting principles or methods which could be applied to the Company's transactions. While the use of estimates means that actual future results may be different from those contemplated by the estimates, the Company believes that alternative principles and methods used for making such estimates would not produce materially different results than those reported.

**Item 3   Quantitative and Qualitative Disclosures About Market Risk.**

Not applicable.

**Item 4.   Controls and Procedures.**

We maintain a system of disclosure controls and procedures that is designed to provide reasonable assurance that information, which is required to be disclosed by the Company in the reports that it files or submits under the Securities and Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and is accumulated and communicated to management in a timely manner. Our Chief Executive Officer and Chief Financial Officer have evaluated this system of disclosure controls and procedures as of the end of the period covered by this quarterly report, and believe that the system is effective. There have been no changes in our internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

# PART II - OTHER INFORMATION

**Item 1.  Legal Proceedings.**

      Not Applicable

**Item 2.  Unregistered Sale of Equity Securities and Use of Proceeds.**

**(a)**     Not applicable.

**(c)**     ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Month #1 (identify beginning and ending dates) | 1-1-08/1-31-08 -0- | -0- | -0- | 163,000 |
| Month #2 (identify beginning and ending dates) | 2-1-08/2-29-08 -0- | -0- | -0- | 163,000 |
| Month #3 (identify beginning and ending dates) | 3-1-08/3-31-08 -0- | -0- | -0- | 163,000 |
| Total | -0- | -0- | -0- | 163,000 |

**Item 3.  Defaults Upon Senior Securities.**

      Not applicable.

**Item 4.  Submission of Matters to a Vote of Security Holders.**

      There were no matters submitted to a vote of shareholders during the first fiscal quarter ended March 31, 2008.

**Item 5.  Other Information.**

Not applicable.

**Item 6.  Exhibits and Reports on Form 8-K.**

(a) Exhibits required by item 601 of Regulation S-K.

| Exhibit Number | Description of Exhibit |
|---|---|
| 31 | Rule 13(a)-14(a)/15(d)-14(a) Certifications. |
| 32 | Section 1350 Certification. |

(b)    Reports on Form 8-K.  The Company has not filed any reports on Form 8-K during the second fiscal quarter ended March 31, 2008.

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

May 15, 2008

**JANEL WORLD TRADE, LTD.**

By:    /s/ James N. Jannello
Chief Executive Officer

**EXHIBIT 31**

## Certification

I, James N. Jannello, Executive Vice President and Chief Executive Officer of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a -15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008                                          /s/ James N. Jannello

## Certification

I, Stephen P. Cesarski, President and Chief Operating Officer, of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: May 15, 2008                                    /s/ Stephen. P. Cesarski


Certification

I, Linda Bieler, Controller and Chief Financial and Accounting Officer, of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008                                   /s/ Linda Bieler

**EXHIBIT 32**

CERTIFICATION
PURSUANT TO 18 U.S.C. §1350

In connection with the report on Form 10-Q of Janel World Trade, Ltd. for the second fiscal quarter ended March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the registrant certifies pursuant to 18 U.S.C. Section 1350 that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Dated: May 15, 2008

/s/ James N. Jannello
James N. Jannello, Executive
Vice President and Chief
Executive Officer

Dated: May 15, 2008

/s/Stephan P. Cesarski
President and Chief
Operating Officer

Dated: May 15, 2008

/s/Linda Bieler
Controller and Chief
Financial and Accounting
Officer

## JANEL WORLD TRADE LTD. AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS

|  | MARCH 31, 2008<br>(Unaudited) | SEPTEMBER 30, 2007<br>(Audited) |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 1,597,609 | $2,469,727 |
| Accounts receivable, net of allowance for doubtful accounts of $48,923 at March 31, 2008 and $42,600 at September 30, 2007 | 5,421,324 | 5,343,958 |
| Marketable securities | 62,164 | 70,880 |
| Loans receivable – officers | 145,760 | 142,440 |
|      - related party | 115,151 | 111,700 |
|      - other | 27,033 | 21,994 |
| Prepaid expenses and sundry current assets | 145,088 | 156,802 |
| **TOTAL CURRENT ASSETS** | **7,514,129** | **8,317,501** |
| **PROPERTY AND EQUIPMENT, NET** | **343,168** | **217,528** |
| **OTHER ASSETS:** | | |
| Intangible assets, net | 3,399,688 | - |
| Security deposits | 49,035 | 49,035 |
| Deferred income taxes | 67,000 | - |
| **TOTAL OTHER ASSETS** | **3,515,723** | **49,035** |
| **TOTAL ASSETS** | **$11,373,020** | **$8,584,064** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Note payable – bank | $ 1,700,000 | $ - |
|      - other | 125,000 | - |
| Accounts payable | 3,095,753 | 3,822,677 |
| Accrued expenses and taxes payable | 136,749 | 205,555 |
| Current portion of long-term debt | 73,239 | 3,795 |
| **TOTAL CURRENT LIABILITIES** | **5,130,741** | **4,032,027** |
| **OTHER LIABILITIES:** | | |
| Long-term debt | 431,213 | 2,550 |
| Deferred compensation | 78,568 | 78,568 |
| **TOTAL OTHER LIABILITIES** | **509,781** | **81,118** |
| **STOCKHOLDERS' EQUITY:** | **5,732,498** | **4,470,919** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$11,373,020** | **$8,584,064** |

See notes to financial statements

## JANEL WORLD TRADE LTD. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF INCOME
(Unaudited)

| | SIX MONTHS ENDED MARCH 31, | | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| **REVENUES** | **$38,349,307** | **$35,031,459** | **$18,281,961** | **$18,303,590** |
| **COSTS AND EXPENSES:** | | | | |
| Forwarding expenses | 33,483,443 | 31,144,581 | 15,934,980 | 16,340,327 |
| Selling, general and administrative | 4,666,805 | 3,754,920 | 2,366,265 | 1,910,744 |
| Amortization of intangible assets | 323,625 | - | 161,813 | - |
| **TOTAL COSTS AND EXPENSES** | **38,473,873** | **34,899,501** | **18,463,058** | **18,251,071** |
| **INCOME (LOSS) FROM OPERATIONS** | **(124,566)** | **131,958** | **(181,097)** | **52,519** |
| **OTHER ITEMS:** | | | | |
| Interest and dividend income | 28,915 | 24,581 | 11,661 | 11,640 |
| Interest expense | (63,120) | (323) | (29,484) | (141) |
| **TOTAL OTHER ITEMS** | **(34,025)** | **24,258** | **(17,823)** | **11,499** |
| **INCOME (LOSS) BEFORE INCOME TAXES** | **(158,771)** | **156,216** | **(198,920)** | **64,018** |
| Income taxes | (18,000) | 67,000 | (36,100) | 27,000 |
| **NET INCOME (LOSS)** | **(140,771)** | **89,216** | **(162,820)** | **37,018** |
| Preferred stock dividends | 7,500 | 3,333 | 3,750 | 3,333 |
| **NET INCOME AVAILABLE TO COMMON STOCKHOLDERS** | **$ (148,271)** | **$   85,883** | **$ (166,570)** | **$   33,685** |
| **OTHER COMPREHENSIVE INCOME NET OF TAX:** | | | | |
| Unrealized gain(loss) from available for sale securities | $   (15,150) | $   1,624 | $   (8,142) | $   927 |
| Basic earnings (loss) per share | $   (.0088) | $   .005 | $   (.0099) | $   .005 |
| Fully diluted earnings (loss) per share | $   (.0086) | $   .005 | $   (.0096) | $   .005 |
| Weighted number of shares outstanding | 16,906,000 | 17,021,973 | 16,906,000 | 17,007,167 |
| Fully diluted weighted number of shares outstanding | 17,306,000 | 17,421,973 | 17,306,000 | 17,407,167 |

{ }

See notes to financial statements

{ }

## JANEL WORLD TRADE LTD. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | CAPITAL STOCK | | PREFERRED STOCK | | TREASURY STOCK | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE GAIN (LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | SHARES | $ | SHARES | $ | | | | | |
| BALANCE – SEPTEMBER 30, 2007 | 17,043,000 | $17,043 | 1,000,000 | $1,000 | $(65,812) | $1,416,558 | $3,090,470 | $11,660 | $4,470,919 |
| Net income | - | - | - | - | - | - | (140,771) | - | (140,771) |
| Convertible preferred stock issuance | - | - | 285,000 | 285 | - | 1,424,715 | - | - | 1,425,000 |
| Dividends to preferred shareholders | - | - | - | - | - | - | (7,500) | - | (7,500) |
| Other comprehensive gains (losses): Unrealized gains (losses) on available-for-sale marketable securities | - | - | - | - | - | - | - | (15,150) | (15,150) |
| BALANCE – MARCH 31, 2008 | 17,043,000 | $17,043 | 1,285,000 | $1,285 | $(65,812) | $2,841,273 | $2,942,199 | $ (3,490) | $5,732,498 |

See notes to financial statements

{}

**JANEL WORLD TRADE LTD. AND SUBSIDIARIES**

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | CAPITAL STOCK | | PREFERRED STOCK | | TREASURY STOCK | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE GAIN (LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | SHARES | $ | SHARES | $ | | | | | |
| **BALANCE – SEPTEMBER 30, 2006** | 17,043,000 | $17,043 | - | $ - | $ - | $ 953,163 | $2,778,324 | $ 2,763 | $3,751,293 |
| Net income | - | - | - | - | - | - | 89,216 | - | 89,216 |
| Convertible preferred stock issuance, net of expenses of $35,605 | - | - | 1,000,000 | 1,000 | - | 463,395 | - | - | 464,395 |
| Purchase of 57,000 shares of treasury stock | - | - | - | - | (28,122) | - | - | - | (28,122) |
| Dividends to preferred shareholders | - | - | - | - | - | - | (3,333) | - | (3,333) |
| Other comprehensive gains: | | | | | | | | | |
| Unrealized gains on available-for-sale marketable securities | - | - | - | - | - | - | - | 1,624 | 1,624 |
| **BALANCE – MARCH 31, 2007** | 17,043,000 | $17,043 | 1,000,000 | $1,000 | $(28,122) | $1,416,558 | $2,864,207 | $ 4,387 | $4,275,073 |

See notes to financial statements

**JANEL WORLD TRADE, LTD. AND SUBSIDIARIES**

CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| | SIX MONTHS ENDED MARCH 31, | |
| | 2008 | 2007 |
|---|---|---|
| **OPERATING ACTIVITIES:** | | |
| Net income (loss) | $ (140,771) | $ 89,216 |
| *Adjustments to reconcile net income (loss) to net* | | |
| *cash provided by (used in) operating activities:* | | |
| Depreciation and amortization | 387,282 | 37,614 |
| Deferred income taxes | (67,000) | - |
| *Changes in operating assets and liabilities:* | | |
| Accounts receivable | (77,366) | 197,993 |
| Loans receivable | (11,810) | - |
| Prepaid expenses and sundry current assets | 11,714 | 42,693 |
| Accounts payable and accrued expenses | (803,230) | 247,350 |
| **NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES** | **(701,181)** | **614,866** |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisition of intangible assets | (2,173,313) | - |
| Acquisition of property and equipment | (189,297) | (27,876) |
| Purchase of marketable securities | (6,434) | (2,726) |
| **NET CASH USED IN INVESTING ACTIVITIES** | **(2,369,044)** | **(30,602)** |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Proceeds received from bank loan | 1,700,000 | - |
| Issuance of long-term debt | 500,000 | - |
| Repayment of long-term debt | (1,893) | (4,193) |
| Issuance of loans receivable | - | 4,568 |
| Repurchase of treasury stock | - | (28,122) |
| Proceeds from sale of preferred stock, net of related expense of $35,605 | - | 464,395 |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | **2,198,107** | **436,648** |
| | | |
| **INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | **(872,118)** | **1,020,912** |
| **CASH AND CASH EQUIVALENTS – BEGINNING OF PERIOD** | **2,469,727** | **1,341,952** |
| **CASH AND CASH EQUIVALENTS – END OF PERIOD** | **$1,597,609** | **$2,362,864** |
| | | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | |
| *Cash paid during the period for:* | | |
| Interest | $ 63,120 | $ (323) |
| Income taxes | $ 151,448 | $ - |
| *Non-cash financing activities:* | | |
| Unrealized gain (loss) on marketable securities | $ (15,150) | $ 1,624 |
| Dividends declared to preferred stockholders | $ (7,500) | $ (3,333) |
| Issuance of convertible preferred stock and note payable | | |
| in connection with business acquisition | $1,550,000 | $ - |

{ }

See notes to financial statements

{ }

**JANEL WORLD TRADE, LTD. AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

MARCH 31, 2008
(Unaudited)

**1    BASIS OF PRESENTATION**

The attached consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. As a result, certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted. The Company believes that the disclosures made are adequate to make the information presented not misleading. The consolidated financial statements reflect all adjustments which are, in the opinion of management, necessary to a fair statement of the results for the interim periods presented. These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes included in the Company's Form 10-K as filed with the Securities and Exchange Commission on or about January 14, 2008.

**2    ACQUISITION OF ORDER LOGISTICS INC.**

On October 18, 2007, Janel World Trade, Ltd. (the "Company") acquired certain assets of Order Logistics, Inc. ("OLI") consisting of proprietary technology, intellectual property (including the name "Order Logistics"), office locations and equipment and customer lists for use in the management and expansion of the Company's international integrated logistics transport services business. The technology acquired by the Company enables it to integrate all of the different aspects of movement and delivery of goods, making the entire process electronically visible in "real time". The Agreement includes non-competition provisions restricting OLI from competing with Janel, and requiring OLI to change its name.

The purchase price for the acquired assets was $3,888,429 and is comprised of $2,338,429 cash paid at closing, the issuance of a $125,000 note payable and the issuance of 285,000 restricted shares of Janel's newly-authorized $.001 par value Series B Convertible Preferred Stock ("Series B"), each share of which is convertible into ten shares of Janel's $.001 par value common stock at any time after October 18, 2009. In connection therewith, the Company borrowed $1,700,000 under its existing line of credit and entered into a term loan agreement for $500,000 with a different bank. The balance of the cash portion was paid from existing cash.

On February 11, 2008, The Company filed a lawsuit in the United States District Court for the Southern District of New York against defendants World Logistics Services, Inc. ("World Logistics"), a Delaware Corporation formerly known as "Order Logistics, Inc."; Richard S. Francis ("Francis"), the President of World Logistics; and Brian P. Griffin ("Griffin"), who was the Chief Executive Officer of World Logistics when Janel completed an acquisition in October 2007 of certain World Logistics assets.

Janel claims that the defendants made false and misleading statements of material facts concerning the exclusivity of the rights to the assets which were sold to Janel by having concealed and withheld the provisions of a settlement agreement with a third-party business associate and creditor made only two days before the closing of the asset sale, in which World Logistics agreed to the cancellation of a restrictive covenant which had prevented the creditor from using World Logistics proprietary computer software, or soliciting its list of valuable customers and employees.

Janel has charged that the defendants violated the anti-fraud provisions of the Federal securities laws, committed common law fraud, breach of contract and other wrongdoing, with the specific intent to defraud Janel and obtain 285,000 shares of its newly authorized Class B convertible preferred

{ }

stock, and more than $2,300,000 in payments by Janel of the defendants' long overdue obligations to suppliers, creditors and tax authorities.

3   **BUSINESS SEGMENT INFORMATION**

The Company is organized into two reportable segments, full service cargo transportation logistics management and computer software sales, support and maintenance.

| Six Months Ended March 31, 2008 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 38,349,307 | $ 38,031,108 | $ 318,199 |
| Net revenues | $ 4,865,864 | $ 4,547,665 | $ 318,199 |
| Operating income (loss) | $ (124,566) | $ 323,183 | $ (447,749) |
| Identifiable assets | $ 11,373,020 | $ 7,623,097 | $ 3,749,923 |
| Capital expenditures | $ 189,297 | $ 22,816 | $ 166,481 |
| Depreciation and amortization | $ 387,282 | $ 47,077 | $ 340,205 |
| Equity | $ 5,732,498 | $ 6,180,247 | $ (447,749) |

| Six Months Ended March 31, 2007 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 35,031,459 | $ 35,031,459 | $ - |
| Net revenues | $ 3,886,878 | $ 3,886,878 | $ - |
| Operating income | $ 131,635 | $ 131,635 | $ - |
| Identifiable assets | $ 7,513,361 | $ 7,513,361 | $ - |
| Capital expenditures | $ 27,876 | $ 27,876 | $ - |
| Depreciation and amortization | $ 37,614 | $ 37,614 | $ - |
| Equity | $ 4,275,073 | $ 4,275,073 | $ - |

| Three Months Ended March 31, 2008 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 18,281,961 | $ 18,219,061 | $ 62,900 |
| Net revenues | $ 2,346,981 | $ 2,284,081 | $ 62,900 |
| Operating income (loss) | $ (181,097) | $ 499,122 | $ (318,025) |
| Identifiable assets | $ 11,373,020 | $ 7,623,097 | $ 3,749,923 |
| Capital expenditures | $ 17,801 | $ 16,437 | $ 1,364 |
| Depreciation and amortization | $ 194,146 | $ 24,010 | $ 170,136 |
| Equity | $ 5,732,498 | $ 6,180,247 | $ (447,749) |

| Three Months Ended March 31, 2007 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 18,303,590 | $ 18,303,590 | $ - |
| Net revenues | $ 1,963,263 | $ 1,963,263 | $ - |
| Operating income | $ 52,378 | $ 52,378 | $ - |
| Identifiable assets | $ 6,743,091 | $ 6,743,091 | $ - |
| Capital expenditures | $ 22,095 | $ 22,095 | $ - |

{ }

| | | | | | |
|---|---|---|---|---|---|
| Depreciation and amortization | $ | 19,540 | $ | 19,540 | $ | - |
| Equity | $ | 4,275,073 | $ | 4,275,073 | $ | - |

**4      SUBSEQUENT EVENT**

In April 2008, the outstanding note payable – bank of $1,700,000 was converted into a term loan payable in monthly installments of $20,238 plus interest at the bank's prime rate plus .75% per annum, or LIBOR plus 2% per annum.  In addition, the bank gave the Company a new credit line of $1,500,000 which expires on March 31, 2009.