William J. Davis (WD 0362)
SCHEICHET & DAVIS, P.C.
Attorneys for Plaintiffs
767 Third Avenue, 24th Floor
New York, New York 10017
(212) 688-3200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JANEL WORLD TRADE, LTD., and ORDER
LOGISTICS, INC.,                                              :          08-cv-01327 (RJS)

                                   Plaintiffs,               :

                         -vs-                                          ECF Case

                                                             :
WORLD LOGISTICS SERVICES, INC., RICHARD S.
FRANCIS, and BRIAN P. GRIFFIN,                               :

                                   Defendants.               :
------------------------------------------------------------------------x

# MEMORANDUM OF POINTS AND AUTHORITIES
# IN OPPOSITION TO THE MOTION OF DEFENDANT
# BRIAN P. GRIFFIN
# TO DISMISS THE PLAINTIFFS' COMPLAINT

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ........................................................................ 5

**FACTS** ............................................................................................................... 5

**STANDARD OF REVIEW** .............................................................................. 6

**ARGUMENT** .................................................................................................... 6

I. PLAINTIFFS' 10b-5 AND CONTROLLING PERSONS CLAIMS SHOULD NOT BE DISMISSED BECAUSE DEFENDANTS MISREPRESENTATIONS AND OMISSIONS WERE MADE "IN CONNECTION WITH" THE PURCHASE OR SALE OF SECURITIES.............................................................................................. 6

II. Common Law Fraud Claims Against Defendant Griffin Are Adequately Pleaded as The Complaint Clearly Alleges that the Defendant Griffin Had a Duty to Disclosure Relevant Information and Plaintiffs Reasonably Relied on the Defendants Upholding This Duty. ...................................................................................................... 13

III. The 10b-5 AND COMMON LAW FRAUD CLAIMS SATISFY THE REQUIREMENTS OF PSLRA, AND ALLEGE FRAUD WITH THE REQUISITE PARTICULARITY UNDER FED. R. CIV. P. 9(b)..................................................... 16

IV. PLAINTIFFS STATE LAW CLAIMS SHOULD NOT BE DISMISSED AS ALL NECESSARY ELEMENTS OF EACH CLAIM HAVE BEEN PLEADED.............. 16

   A.   The Court Should Not Dismiss Plaintiffs' Cause of Action in Conversion Because Defendants Exercised the Requisite "Dominion and Control" over Plaintiffs' Property.................................................................................................. 17

   B.   Defendants unjustly enriched themselves by defrauding Plaintiffs in connection with the Plaintiffs purchase of World Logistics. ...................................................... 17

   The Claim for Breach of Covenant of Good Faith and Fair Dealing, as Against Griffin, Should Not be Dismissed Because He Was a Party to the Asset Purchase Agreement.................................................................................................................. 18

**CONCLUSION**……………………………………………………………………19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.T. Brod & Co. v. Perlow*, 375 F. 2d 393 (2d Cir. 1967)........................................... 7,9,10

*Aaron Ferer & Sonas Ltd. v. Chase Manhattan Bank*, 731 F.2d 112 (2d Cir. 1984)....... 13

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146

   (2d Cir. 1995)..................................................................................................... 13

*Bazak Int'l Corp. v Tarrant Apparel Group*, 347 F. Supp. 2d 1 (SDNY 2004) ............... 17

*Chemical Bank v. Arthur Anderson & Co.*, 726 F. 2d 930 (2d Cir. 1984) ................ 7, 8, 9

*Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899 (S.D.N.Y. 1990)................................... 7, 8

*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)......................... 6

*Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)......................................................... 6

*Geisler v. Petrocelli,* 616 F.2d 636 (2d Cir.1980) ............................................................ 6

*Golden Pacific Bancorp v. Federal Deposit Ins. Corp.,* 273 F.3d 509 (2d Cir.2001)...... 17

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F. 2d 729 (2d Cir. 1984)............. 15

*Lazard Freres & Co. v. Protective Life Ins. Co.*,108 F.3d 1531 (2d Cir. 1997)........ ..14,15

*Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2nd Cir. 1980) .......................................... 13,14

*Mfrs. Hanover v. Smith Barney.*, 770 F. Supp. 176 (S.D.N.Y. 1991).............................. 10

*Production Resource Group, LLC v. Stonebridge Partners Equity Fund, L.P.*, 6

   F.Supp.2d 236 (SDNY 1998)......................................................................... 11

*Robbins v. Koger Properties Inc.*, 116 F.3d 1441 (11th Cir. 1997).................................. 12

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774 (2d

   Cir.1984) ..................................................................................................... 6

*S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38 (2d Cir. 1986) ............................... 7, 8, 9

*State of New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 746 N.Y.S. 2d 637…

..................................................................................................... 17

*Superintendent of Ins. of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, S.Ct.

165 (1971) ................................................................................................... 7

*Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 248 N.Y.S.2d 975 (N.Y.A.D.1964)............. 14

*Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 N.Y. 2d 36 (1995) 17

*Weiss v. Wittcoff,* 966 F.2d 109 (2d Cir. 1992) ................................................. 12

**Statutes and Rules:**

F.R.C.P. 9(b) …………………………………………………………………………16

17 C.F.R. § 240.10b-5; Rule 10b-5……………………………………………6, 7, 9, 10

## PRELIMINARY STATEMENT

Plaintiffs Janel World Trade, Ltd. and Order Logistics, Inc. submit this memorandum in opposition of the Defendant's motion to dismiss the Complaint. The Complaint pleads fraud with sufficient particularity as against all Defendants pursuant to PSLRA and Fed. R. Civ. P. 9 (b). The Complaint states that the Defendant Griffin was the Chief Executive Officer of World Logistics, with his principal place of business in Champaign, Illinois. The specific misrepresentations or omissions by the Defendants, including Mr. Griffin, as an officer of the corporation are spelled out in Plaintiffs' Complaint ¶13-31, attached to the Griffen Memorandum of Law as Exhibit "A." All state law claims are adequately pleaded. The Complaint clearly states the allegations setting forth the time, place, and contents of the misrepresentation and omissions made by the Defendants, including Mr. Griffin. See  Complaint ¶ 13-31.

## FACTS

This action arose out of the Defendants fraudulent activities and material contract breaches by which they deceived the Plaintiffs into purchasing "exclusive" rights to certain assets when, in fact, Defendants had knowingly compromised the exclusivity by having secretly granted rights to use or exploit those assets to a third-party creditor of World Logistics. The Defendants knew that disclosure of the grant of rights would result in the Plaintiffs refusing to go forward with the asset acquisition transaction. Exhibit "1" is a copy of an email exchange between Defendants Francis and Griffin on September 30, 2007, in which Francis sent the draft grant of rights to Griffin for review, and Griffin responded that "…Janel will never allow him (i.e. the third-party) to use the eBridge brand and compete with us (they have been very focused on this proprietary software

issue)." The terms of the grant of rights were never disclosed to the Plaintiffs by the Defendants.

The asset acquisition transaction was completed, shares of Janel's convertible preferred stock were issued, and Janel made payments of more than $2,300,000 to Defendants and their creditors. Plaintiffs did not discover the terms of the grant of rights until months after the transaction, when they received a copy of the grant of rights from the third-party.

## STANDARD OF REVIEW

In ruling on a motion to dismiss, the Court must accept as true all well-pleaded assertions of fact alleged in the complaint. See *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998).

> The Court may not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (internal quotations omitted).

In deciding a motion to dismiss, the Court determines the legal feasibility of the complaint, but does not weigh the sufficiency of the evidence or resolve the merits of any issues that may be presented. *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984); *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980).

## ARGUMENT

I. PLAINTIFFS' 10b-5 AND CONTROLLING PERSONS CLAIMS SHOULD NOT BE DISMISSED BECAUSE DEFENDANTS MISREPRESENTATIONS AND OMISSIONS WERE MADE "IN CONNECTION WITH" THE PURCHASE OR SALE OF SECURITIES.

The Defendant's narrow reading of the "in connection with" requirement cannot be reconciled with the broad construction of the nexus requirement as articulated by the Supreme Court in *Superintendent of Ins. of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), as well as Second Circuit cases. See *S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38, 42 (2d Cir. 1986), cert. denied, 476 U.S. 1171, 106 S.Ct. 2894 (1986); *A.T. Brod & Co. v. Perlow*, 375 F. 2d 393 (2d Cir. 1967).

> We believe that §10b and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Superintendent of Ins. of New York*, supra, 404 U.S. at 11. "…[S]ince there was a 'sale' of a security and since fraud was used 'in connection' with it, there is redress under §10b…" *Id.* at 12.

> When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of informed judgment on the part of its board regarding the merits of the transaction. In this situation, the private right of action recognized under Rule 10b-5 is available as a remedy for the corporate disability." *Id.* at 13.

Section 10b and Rule 10(b)(5) should be readily available as a remedy in this action, because the Defendants failure to disclose the material fact that the exclusive rights had been compromised resulted in the Plaintiffs being disabled from availing themselves of "informed judgment" regarding the merits of the transaction.

The Second Circuit follows this broad reading of the statute. The Defendants base their argument on a narrow reading of the statute, primarily focused upon *Chemical Bank v. Arthur Anderson & Co.*, 726 F. 2d 930 (2d Cir. 1984) and *Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899 (SDNY 1990), which followed the holding in *Chemical Bank.*

These cases differ factually from ours. In *Chemical Bank*, securities were merely pledged as collateral, whereas in this case, Defendants were acquiring shares of Plaintiffs' convertible preferred stock. Here, Defendants fraudulently acquired the securities, as opposed to *Chemical Bank*, where there was no acquisition of any securities.

In *S.E.C. v. Drysdale Securities, Inc.,* 785 F. 2d 38, 42 (2d Cir. 1986), the court analyzed the facts and distinguished the result from *Chemical Bank*. The *Drysdale* court held that alleged misrepresentations made with respect to a company's financial condition were in connection with a purchase and sale of securities for the purpose of statutes prohibiting fraud in connection with a purchase or sale of securities. *Id.* One deciding factor for the court was that the lender in *Chemical Bank* merely held collateral for security, and never took title to securities. *Id.* at 41.

As in *Drysdale,* this case regards a transaction "…where the securities were transferred as a direct result of a misrepresentation." *Drysdale,* 785 F. 2d at 43. Plaintiffs exchanged securities for exclusive rights to assets. No such exclusivity existed, and that knowledge was intentionally denied to the Plaintiffs.

The District Court in *Citibank*, relying on *Chemical Bank*, held that a last minute substitution of a promissory note for cash as consideration for stock was not sufficiently related to the nature or value of the stock. This narrow holding is inconsistent with the Second Circuit's decision in *Drysdale*, which held that the "in connection with" requirement is satisfied where defendants allegedly misrepresented their financial condition to banks and securities dealers. *Id.* at 42. *Drysdale* found that "…misrepresentation clearly pertained to a significant part of the consideration offered…," and that the allegedly fraudulent warranty as to the solvency of the defendant

company "…was essential to the value received by the other party in a securities transaction." *Drysdale*, 785 F. 2d at 42.

In *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir.1967), the court held that a §10(b) claim was stated by Plaintiff's allegation of defendant's scheme to purchase securities with a fraudulent intent to pay only if their market value had increased by the date payment was due. The court stated that

> "[n]either §10(b) nor Rule 10(b)(5) contains any language which would indicate that those provisions were intended to deal only with fraud as to the "investment value" of the securities and indeed it is established that a 10(b)(5) action will survive even though the fraudulent scheme or device is unrelated to the 'investment value.'" *Id.* at 396-7.

Accordingly, this Court should find that although the misrepresentations did not concern the value of the securities themselves, there is enough for a §10(b) claim because securities were traded as a direct result of the misrepresentation.

If this court were to accept the Defendants' position, §10(b) would be applicable only to fraudulent misrepresentations by a seller of securities, but not those of a buyer. The court in *Chemical Bank* specifically stated that:

> …the purpose of §10b and Rule 10b-5 is to protect persons who are deceived in securities transactions - to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or a consideration known to the buyer not to be what it purports to be. *Chemical*, 726 F. 2d at 943.

Here, Plaintiffs parted with securities in exchange for property which the Defendants knew was not what they promised to the Plaintiffs. The exclusive rights which the Plaintiffs were buying from the Defendants with Janel securities were stripped of their exclusivity by the Defendants only days before the closing. In fact, the email exchange between Griffin and Francis (Exhibit 1) shows that Defendants knew that the

Plaintiffs had bargained for exclusive proprietary rights to the software and customer list which no longer existed.

The Defendants also rely on *Mfrs. Hanover v. Smith Barney.*, 770 F. Supp. 176, 181 (SDNY 1991). *Mfrs. Hanover* can be distinguished factually from the present case in that the Plaintiff in *Mfrs. Hanover* did not have standing to bring a §10b claim because he was not a purchaser or seller of securities. *Id.* at180.  Here, the Plaintiffs are sellers of securities and thus have standing. "[P]urchasers and sellers of securities have standing to bring private cause of action under §10(b) of Securities Exchange Act of 1934." *Id.*

The court in *Mfrs. Hanover* noted that the lack of standing was not the sole reason for dismissal. *Id.* The court, quoting *Kearney v. Prudential-Bache Securities, Inc.*, 701 F. Supp. 416, 424 (SDNY 1988), stated that:

> …the 'in connection with' requirement mandates that the alleged fraud concern the fundamental nature of the securities: namely characteristics and attributes that would induce an investor to buy or sell the particular securities.

As stated above, such a "fundamental nature of the securities" approach to the nexus requirement would mean that the §10(b) remedy was available only when the fraud was committed by the seller, and bar the remedy where the fraud was committed by the buyer, such as here. In *Luce v. Edelstein*, 802 F. 2d 49, 55 (2d Cir. 1986), the court held that:

> …making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate § 10(b) where the promise is part of the consideration for the transfer of securities. *Id,* citing *A.T. Brod & Co. v. Perlow*, supra, among other cases.

Likewise, the specific promise for the exclusive rights to certain World Logistics assets, while secretly compromising that exclusivity by granting the right to freely use

those assets to a third party creditor is a clear violation of §10(b), where the Defendants obtained Plaintiffs securities as consideration for the knowingly false promise. The fraudulent misrepresentation was essential to the value received by the other party in this securities transaction. The Plaintiffs would not have issued shares of its securities as consideration, but for the Defendants' fraudulent promise of rights of exclusivity.

Defendant Griffin also relies on *Production Resource Group, LLC v. Stonebridge Partners Equity Fund, L.P.*, 6 F.Supp.2d 236, 239 (SDNY 1998) to argue that an alleged fraudulent refusal to transfer stock does not satisfy the "in connection with" requirement because it does not pertain to the "fundamental nature," or the value, of the securities themselves. In *Production Resource*, the basis for the plaintiff's claim was that the defendant failed to consummate an agreement for the sale of a company, i.e. defendant refused to transfer stock. *Id.*

The court held, correctly in our view, that a misrepresentation as to the intent to sell a business to the plaintiff "…did not pertain to the value of the stock…" of that business and thus did not satisfy the "in connection with" requirement. *Id.* at 240.

This case is easily distinguished from *Productions Resource*. Our complaint alleges that by promising Janel exclusive rights to World Logistics software and customer list in exchange for Janel money and securities, Defendants' misrepresentation of the value of the rights also misrepresented the value of the securities by inducing Plaintiffs to sell the securities for less than their value. Similarly, in *Pail v. Precise Imports Co.*, 1999 WL 681384 (SDNY1999), the plaintiff's complaint alleged that by claiming that an acquisition company had the exclusive right to buy the defendant corporation and sell it

to outside investors, the defendant had misrepresented the value of the stock to the plaintiff. *Id.* at 4. The court held that:

> [b]ecause it alleges a misrepresentation concerning the value of stock and not merely a refusal to transfer stock, the complaint sufficiently pleads fraud in connection with the purchase or sale of securities." *Id.*

The Complaint sufficiently alleges loss causation. To escape a dismissal of a securities fraud complaint, the plaintiff must demonstrate that the fraud caused the plaintiff to engage in the transaction, and that it also caused the harm actually suffered. *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir. 1992). Our Complaint adequately notifies Defendant of the losses claimed and the causal connection between the losses and Defendant's allegedly fraudulent conduct. See Complaint ¶ 32-35. To prove loss causation, a plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Robbins v. Koger Properties Inc.,* 116 F.3d 1441, 1447 (11th Cir. 1997). Whether the alleged omissions and misstatements actually were the cause-in-fact of the loss, is a question properly reserved for trial. Accordingly, the Court should deny the Defendants' Motion to Dismiss for absence of loss causation.

Defendant Griffin claims that no economic loss can be alleged because the value of Janel stock began to increase after it entered into the Asset Purchase Agreement. The fact that the stock price has increased is utterly irrelevant, as this is not a suit brought by the shareholders. The plaintiff in this case is the corporation and the corporation has clearly alleged that it has suffered an economic loss as a result of the fraudulent transaction perpetrated by the defendants. For example, in the six months period ending on March 31, 2007, the plaintiff-corporation had a net income of $85,883. In the same period the following year, the corporation had a loss of $(148,271).  In the three months

ending in March 31, 2007, the corporation had an income of $33,685. In the same period the following year, the corporation had a net loss of $(166,570). See Janel World Ltd. and Subsidiaries Consolidated Statements of Income, attached hereto as Exhibit 2. The fluctuations in the stock prices since the date of the agreement are not an indication that Plaintiffs had not suffered a loss. The inflation and deflation of stock prices are caused by many factors having an effect on the market. Defendant's Exhibit C displaying fluctuating stock prices is irrelevant.

II. Common Law Fraud Claims Against Defendant Griffin Are Adequately Pleaded as The Complaint Clearly Alleges that the Defendant Griffin Had a Duty to Disclosure Relevant Information and Plaintiffs Reasonably Relied on the Defendants Upholding This Duty.

New York law requires proof of the traditional five elements of common law fraud: misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages, and does not recognize a separate due diligence element, much less one that must be independently proved by clear and convincing evidence. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2nd Cir. 1980). There is a line of cases which hold that a party to a transaction has a duty to disclose if: 1) the party has superior knowledge of certain information; 2) the information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge. *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 155 (2d Cir. 1995); *Aaron Ferer & Sonas Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984). Such is clearly the case here. Defendant Griffin knew that Plaintiffs would never agree to a third party use of the "exclusive" asset rights, and was aware that Plaintiffs "…were very focused on this proprietary software issue." See Exhibit "1".

When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth. *Mallis*, 615 F.2d at 80 (2d Cir.1980); *see also Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 470 N.Y.S.2d 431, 432-33 (N.Y.App.Div.1984) (plaintiff may have been justified in relying on defendant's misrepresentations because he had no way of knowing that the land he purchased had in fact not been used as a horse farm, but rather as an industrial waste dump).

In *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 911, 248 N.Y.S.2d 975, 977 (N.Y.A.D.1964), the court held that

[w]here…the facts were peculiarly within the knowledge of the defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by inspecting the public records is not fatal to their action.

Moreover, the court in *Lazard Freres & Co. v. Protective Life Ins. Co.*,108 F.3d 1531, 1542 (2d Cir. 1997) noted that:

…this statement cannot be viewed as establishing that, under New York law, the information had to be available only to the defendant and absolutely unknowable by the plaintiff before reliance can be deemed justified. See also *Mallis,* 615 F.2d at 80. ("indeed some cases have imposed liability in situations in which plaintiff could have determined the truth with relatively modest investigation.").

The court in *Pail* held that the plaintiff had adequately alleged reasonable reliance in his complaint because the plaintiff alleged that he requested, received and relied on documentation and assurances concerning the issuance of shares. *Pail*, 1999 WL 681384 at 3. Likewise, our Complaint in ¶ 19-31 alleges that Plaintiffs explicitly and repeatedly required all outstanding liens to be satisfied and released and all of the assets and rights being conveyed to Plaintiff be exclusive and without any conflicting use and Plaintiff requested reassurance that World Logistics had no knowledge of any claims, infringements or conflicting use by any person. See Complaint ¶ 19.  The Complaint

further alleges that material information was knowingly and intentionally hidden from Janel. See Complaint ¶ 28.

In *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F. 2d 729, 732 (2d Cir. 1984), as the Defendant cites, there was a contractual provision expressly disclaiming reliance on any oral representations. The court in *Grumman* held that where a party specifically disclaims reliance upon a representation in a contract, it cannot later assert that it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon. *Id.* No such contractual disclaimer is present in the instant case and, as such, *Grumman* is not relevant in this matter.

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 288 (2d Cir.. 1998) is also factually different from this case. Unlike *Granite*, Plaintiffs in this case were not relying on mere puffery. In evaluating the characteristics of complex derivative securities, the court held that no reasonable investor could rely solely on short-hand phrases like "bullish" or "bearish," or month-end valuations or portfolio analyses made after the purchase without conducting some independent due diligence. *Id.* at 290. Here the reliance is on an expressed promise of exclusive rights, a right the Defendants were well aware was of utmost importance to Plaintiffs, and that Plaintiffs would never have signed the "Purchase Agreement" had they known exclusivity had been compromised.

In *Lazard Freres*, the court stated that,

> "[M]ost importantly…these cases involved situations in which the relevant facts were easily accessible to the relying party. Thus, the principle embodied in these precedents is that "[w]here the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable." *Lazard Freres.*, 108 F.3d at 1542.

But in this case, the fact that exclusivity had been compromised was not readily available to Plaintiffs. After extensive negotiations and due diligence, Plaintiffs agreed to the Purchase Agreement only after receiving reassurance that all liens had been lifted and that all assets and rights being conveyed to the Plaintiffs were exclusive and without any conflicting use. Under no circumstances would the Plaintiffs have reason to believe that the defendants had made such a secretive dealing with the third-party, Mr. Cunningham, just eight days prior to the closing.

III. The 10(b)(5) AND COMMON LAW FRAUD CLAIMS SATISFY THE REQUIREMENTS OF PSLRA, AND ALLEGE FRAUD WITH THE REQUISITE PARTICULARITY UNDER FED. R. CIV. P. 9(b).

The Complaint pleads fraud with sufficient particularity as against Griffin pursuant to PSLRA and Fed. R. Civ. P. 9 (b). In a securities fraud case, Rule 9(b) requires the identification of the particular defendants with whom the plaintiffs dealt directly, the occasions on which the misrepresentations were made, the specifics of the misrepresentations and how they are considered false, and the particular defendants who made the statements. The Complaint states that the Defendant Griffin was the Chief Executive Officer of World Logistics, with his principal place of business in Champaign, Illinois. The specific misrepresentations or omissions by the Defendants, including Mr. Griffin, as an officer of the corporation are spelled out in Plaintiffs' Complaint ¶ 13-31.

IV. PLAINTIFFS STATE LAW CLAIMS SHOULD NOT BE DISMISSED AS ALL NECESSARY ELEMENTS OF EACH CLAIM HAVE BEEN PLEADED.

All the state law claims are adequately pleaded. The Complaint clearly states that allegations setting forth the time, place and contents of the misrepresentation and omissions made by the Defendants, including Mr. Griffin.

A.  The Court Should Not Dismiss Plaintiffs' Cause of Action in Conversion Because Defendants Exercised the Requisite "Dominion and Control" over Plaintiffs' Property.

Defendant Francis's argument that the conversion claim should be dismissed because Janel had not tendered or transferred the Class B preferred stock to defendant Francis is contrary to the rulings in this Circuit. The court in the *State of New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S. 2d 637, 646 iterated that "…[t]o be sure, the wrongful exercise of dominion need not consist of a "manual taking, on the defendants' part." The court stated that the act of interference may leave the goods physically undisturbed, yet still impair the owner's rights. *Id.* See also *Pease v Smith*, 61 NY 477, 481 (1875). "Courts that state that manual taking is unnecessary do so in order to protect the rights of owners distressed by real, yet intangible, transgressions." *Id.*  See also *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36, 43 (1995). Thus, although Francis may have not yet received any of the Series B Preferred Stock, he has undoubtedly impaired Janel's rights and thus the claim for conversion should not be dismissed.

B.  Defendants unjustly enriched themselves by defrauding Plaintiffs in connection with the Plaintiffs purchase of World Logistics.

To state a claim of unjust enrichment under New York law, the plaintiff must allege:

> (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or [benefit] to the plaintiff." *Golden Pacific Bancorp v. Federal Deposit Ins. Corp.,* 273 F.3d 509, 519 (2d Cir.2001).

The court in *Bazak Int'l Corp. v Tarrant Apparel Group*, 347 F. Supp. 2d 1, 4 (SDNY 2004) stated that a plaintiff may simultaneously allege breach of contract and unjust enrichment in its claim. The Complaint alleges that Defendants unjustly received

something of value, namely the Class B Preferred Shares issued to the Defendants. While an unjust enrichment claim ordinarily is precluded when there is a valid and enforceable contract, *id.* at 4, the validity of the contract is at issue, where Defendant perpetrated fraud on the Plaintiffs in order that they enter into a contract with the Defendants.

C. The Claim for Breach of Covenant of Good Faith and Fair Dealing, as Against Griffin, Should Not be Dismissed Because He Was a Party to the Asset Purchase Agreement.

Defendant Griffin has been the Chief Executive Officer and a principal shareholder of World Logistics. Upon information and belief, each Defendant, including Griffin is the agent and/or conspirator of the other Defendant, and knowingly approved, participated in, and/or ratified the wrongful actions and omissions alleged in the Complaint, and are thus mutually responsible for the wrongful conduct of each other. Furthermore, as the email exchange illustrated, Defendant Griffin knew that Plaintiffs would not have agreed to non-exclusive rights to World Logistics intellectual property, yet failed to inform Plaintiffs that such exclusivity had been compromised. See Exhibit "1". Therefore, a claim for breach of covenant of good faith and fair dealing can be asserted against Defendant Griffin, as he was clearly a party to the Asset Purchase Agreement and the misrepresentations and omissions that resulted in damages for the Plaintiffs.

## <u>CONCLUSION</u>

It is for these reasons that there is no sound basis for a dismissal of the Plaintiffs'

Complaint. The motion of the moving Defendants Griffin and Francis should be denied

Dated: New York, New York
       June 13, 2008

                                        Respectfully submitted,

                                        **SCHEICHET & DAVIS, P.C.**

                              By:     s/_____
                                        William J. Davis (WD 0362)
                                        767 Third Avenue, 24th Floor
                                        New York, NY  10017
                                        (212) 688-3200

Of Counsel:

Khine Aung, Esq.

-----Original Message-----

From:  briangriffin@orderlogistics.com
Subj:  Re: FW: Special Request - draft agreement attached [mx]
Date:  Sun Sep 30, 2007 2:01 pm
Size:  1K
To:    "Richard Francis" <Rich@balrrexp.com>

FYI - I will review but Janel will never allow him to use the eBridge brand and compete with us
(they have been very focused on this proprietary software issue).

-----Original Message-----

From:  "Richard Francis" <Rich@balrrexp.com>
Subj:  FW: Special Request - draft agreement attached [mx]
Date:  Sun Sep 30, 2007 11:52 am
Size:  1K
To:    <BrianGriffin@OrderLogistics.com>

     Brian, please review and see if there is anything here we  can work with. Does Order
Logistics still market under the eBridge brand?  Also, we can adjust shares and so on. Just see if
it's in anyway worth  talking about. He wants the right to compete and use that name.  Don't let
it bother you. I haven't promised anything more than I would  throw it on the table. Thanks for
the updates this weekend. I think  we're close. I have 1st Nat of SC standing by to write the note
to Janel  and to release us. Boswell is reading to sign also. We need  Gayle. If you can find his
attorney's name let me know. Thanks  again.

    From: Braddock Cunningham  [mailto:bcunningham@braddockonline.com]
Sent: Saturday, September 29,  2007 11:30 AM
To: Richard Francis
Subject: RE: Special  Request - draft agreement attached [mx]


Rich,
Here is a draft agreement that we can work with

Braddock G  Cunningham   --- message truncated ---

EXHIBIT No. 1

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C.  20549

# FORM 10-Q

X.    QUARTERLY REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For the quarterly period ended: **March 31, 2008**

—    TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES
EXCHANGE ACT OF 1934

### Commission File No. 333-60608

# JANEL WORLD TRADE, LTD.
(Exact name of registrant as specified in its charter)

| **NEVADA** | **86-1005291** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification Number) |

| **150-14 132nd Avenue, Jamaica, NY** | **11434** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

### (718) 527-3800
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes X   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "large accelerated filer" and "accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer [    ]        Accelerated filer [    ]        Non-Accelerated filer [X]

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).                                                        Yes   No X

State the number of shares outstanding of each of the issuer's class of common equity, as of the latest practicable date:  16,977,188.

EXHIBIT No. 2

## PART I - FINANCIAL INFORMATION

**Item 1.  Financial Statements.**

(a)   Janel's unaudited, interim financial statements for its second fiscal quarter (the three and six months ended March 31, 2008) have been set forth below. Management's Discussion and Analysis of the Company's Financial Condition and the Results of Operations for the second fiscal quarter will be found at Item 2, following the financial statements.

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Forward Looking Statements**

The statements contained in all parts of this document that are not historical facts are, or may be deemed to be, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements include, but are not limited to, those relating to the following: the effect and benefits of the Company's reverse merger transaction; Janel's plans to reduce costs (including the scope, timing, impact and effects thereof); potential annualized cost savings; plans for direct entry into the trucking and warehouse distribution business (including the scope, timing, impact and effects thereof); the Company's ability to improve its cost structure; plans for opening additional domestic and foreign branch offices (including the scope, timing, impact and effects thereof); the sensitivity of demand for the Company's services to domestic and global economic and political conditions; expected growth; future operating expenses; future margins; fluctuations in currency valuations; fluctuations in interest rates; future acquisitions and any effects, benefits, results, terms or other aspects of such acquisitions; ability to continue growth and implement growth and business strategy; the ability of expected sources of liquidity to support working capital and capital expenditure requirements; future expectations and outlook and any other statements regarding future growth, cash needs, operations, business plans and financial results and any other statements that are not historical facts.

When used in this document, the words "anticipate," "estimate," "expect," "may," "plans," "project," and similar expressions are intended to be among the statements that identify forward-looking statements. Janel's results may differ significantly from the results discussed in the forward-looking statements. Such statements involve risks and uncertainties, including, but not limited to, those relating to costs, delays and difficulties related to the Company's dependence on its ability to attract and retain skilled managers and other personnel; the intense competition within the freight industry; the uncertainty of the Company's ability to manage and continue its growth and implement its business strategy; the Company's dependence on the availability of cargo space to serve its customers; effects of regulation; its vulnerability to general economic conditions and dependence on its principal customers; accuracy of accounting and other estimates; risk of international operations; risks relating to acquisitions; the Company's future financial and operating results, cash needs and demand for its services; and the Company's ability to maintain and comply with permits and licenses; as well as other risk factors described in Janel's Annual Report on Form 10-K filed with the SEC on January 15, 2008. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes may vary materially from those projected.

**Overview**

The following discussion and analysis addresses the results of operations for the three and six months ended March 31, 2008, as compared to the results of operations for the three and six months ended March 31, 2007. The discussion and analysis then addresses the liquidity and financial condition of the Company, and other matters.

**Results of Operations**

Janel operates its business as two reportable segments comprised of: 1) full-service cargo transportation logistics management, including freight forwarding – via air, ocean and land-based carriers – customs brokerage services, warehousing and distribution services, and other value-added logistics services, and 2) computer software sales, support and maintenance.

**Three Months Ended March 31, 2008 Compared to Three Months Ended March 31, 2007**

**Revenue.** Revenue for the second quarter of fiscal 2008 was $18,281,961, as compared to $18,303,590 for the same period of fiscal 2007, a year-over-year decrease of $(21,629), or (0.1)%. For the three months of fiscal 2008, transportation logistics accounted for revenue of $18,219,061, while computer software revenue was $62,900, generated during the quarter from the Company's October 18, 2007 acquisition of certain assets of World Logistics, Inc. (formerly named "Order Logistics Inc"). There was no comparable computer software-related revenue in the fiscal 2007 period. The essentially flat level of transportation logistics revenue reflected the relative equality of overall shipping activity by existing customers between the two periods. Computer software-related revenue during the period was negatively affected as the Company closed former World Logistics operations in South Carolina, which were then consolidated into the Company's Chicago operations.

**Forwarding Expense.** Forwarding expense is primarily comprised of the fees paid by Janel directly to cargo carriers to handle and transport its actual freight shipments on behalf of its customers between initial and final terminal points. Forwarding expense also includes any duties and/or trucking charges related to the shipments. As a general rule, revenue received by the Company for shipments via ocean freight are marked up at a lower percentage versus their related forwarding expense than are shipments via airfreight, i.e., forwarding expense as a percentage of revenue is generally higher (and the Company earns less) for ocean freight than for airfreight.

For the second quarter of fiscal 2008, forwarding expense decreased by $405,347, or 2.5%, to $15,934,980, as compared to $16,340,327 for the second quarter of fiscal 2007. The percentage decrease in forwarding expense was greater than the percentage decrease in transportation logistics revenue, down 0.5%, year-over-year, yielding a favorable decline of 2.1 percentage points in the measure of forwarding expense as a percentage of revenue to 87.2% in the second quarter of fiscal 2008, from 89.3% for the second fiscal quarter of 2007. This is principally the result of increased average margins earned by the Company on ocean freight shipments in the fiscal 2008 quarter, which also accounted for a higher proportion of the quarter's shipping activity.

**Selling, General and Administrative Expense.** Selling, general and administrative expense in second quarter of fiscal 2008 increased by $455,521, or 23.8%, to $2,366,265, as compared to $1,910,744 in the second quarter of fiscal 2007. The year-over-year dollar increase in SG&A primarily resulted from the additional expenses related to additional employees added to the Company's payroll during the fiscal 2008 first quarter as a result of its asset acquisition

during that period. SG&A as a percentage of revenue increased by 250 basis points from 10.44% in the second quarter of fiscal 2007, to 12.94% in the second quarter of fiscal 2008.

**Income (Loss) Before Taxes.** Janel's results fell from an income before taxes of $64,018 in the second quarter of fiscal 2007 to a loss before taxes of $(198,920) in the second quarter of fiscal 2008. Second quarter 2008 charges of $161,813 related to amortization of intangible assets and $10,797 related to increased depreciation, both pertaining essentially to the Company's asset acquisition in October 2007, and incremental interest expense during the fiscal 2008 second quarter of $29,343, pertaining principally to acquisition financing, (see Note 2 to financial statements), more than accounted for the reported quarterly pretax loss.

**Income Taxes.** The effective income tax rate in both the 2008 and 2007 fiscal periods reflects the U.S. federal statutory rate and applicable state income taxes.

**Net Income.** Net loss available to common shareholders for the second quarter of fiscal 2008 was $(166,570), or $(0.0096) per fully diluted share, as compared to net income available to common shareholders of $33,685, or $0.005 per fully diluted share, in the second quarter of fiscal 2007. The same principal factors as described above for the second fiscal quarter 2008 loss before taxes contributed to the period's net loss.

**Six Months Ended March 31, 2008 Compared to Six Months Ended March 31, 2007**

**Revenue.** Revenue for the six months ended March 31, 2008 was $38,349,307, as compared to $35,031,459 for the same period of fiscal 2007, a year-over-year increase of $3,317,848, or 9.5%. The higher level of revenue primarily reflected a net year-over-year rise in shipping activity by existing customers as the generally weaker dollar has hampered the level of imports to a greater extent than it has benefited exports. For the six months of 2008, transportation logistics accounted for revenue of $38,031,108, while computer software revenue was $318,199.

**Forwarding Expense.** For the six months ended March 31, 2008, forwarding expense was $33,483,443, as compared to $31,144,581 for the same period of fiscal 2007, a year-over-year increase of $2,338,862, or 7.5%. The percentage increase was somewhat less than the increase in transportation logistics revenue, up 8.6%, for the six months ended March 31, 2008 as compared to fiscal 2007, resulting in forwarding expense as a percentage of revenue declining marginally to 87.3% as compared to the year-earlier 88.9%, an improvement of 1.6 percentage points. This is principally the result of increased average margins earned by the Company on ocean freight shipments in the fiscal 2008 six months, which also accounted for a higher proportion of the half's shipping activity.

**Selling, General and Administrative Expense.** For the six-month periods ended March 31, 2008 and 2007, selling, general and administrative expenses were $4,666,805 (12.17% of revenue) and $3,754,920 (10.72%), respectively. This represents a year-over-year increase of $911,885, or 24.3%. The year-over-year dollar increase in SG&A resulted from a additional expenses related to additional employees added to the Company's payroll during the fiscal 2008 first half as a result of its asset acquisition in October 2007.

**Income (Loss) Before Taxes.** Janel reported a loss before taxes of $(158,771) for the six months ended March 31, 2008 as compared to income before taxes of $156,216 for the six months ended March 31, 2007. First half 2008 charges of $323,625 related to amortization of intangible assets and $26,043 related to increased depreciation, both pertaining essentially to the Company's asset acquisition in October 2007, and incremental interest expense during the 2008 first half of $62,797, pertaining principally to acquisition financing, (see Note 2 to financial statements), accounted for significantly more than the reported six-months pretax loss.

**Income Taxes.** The effective income tax rate in both the 2008 and 2007 fiscal periods reflects the U.S. federal statutory rate and applicable state income taxes.

**Net Income.** Janel reported net loss available to common shareholders for the six months ended March 31, 2008 of $(148,271), or $(0.0086) per diluted share, down $234,154 as compared to a net income available to common shareholders of $85,883 or $0.005 per diluted share, for the six months ended March 31, 2007. The same principal factors as described above for the first half 2008 loss before taxes contributed to the period's net loss.

## Liquidity and Capital Resources

Janel's ability to meet its liquidity requirements, which include satisfying its debt obligations and funding working capital, day-to-day operating expenses and capital expenditures depends upon its future performance, and is subject to general economic conditions and other factors, some of which are beyond its control.

During the six months ended March 31, 2008, Janel's net working capital (current assets minus current liabilities) decreased by approximately $(1,902,086), or (44.4)%, reflecting an decrease in cash and cash equivalents of approximately $872,000, plus the addition of notes payable totaling $1,825,000, only partially offset by lower accounts payable of approximately $727,000. Janel's cash flow performance for the six months is not necessarily indicative of future cash flow performance.

In July 2005, Janel decreased its line of credit from $3,000,000 to $1,500,000, because cash flow had become adequate for financing its receivables, and because it obtained a reduced interest rate. During the first quarter of 2008, to help finance the Company's acquisition of certain assets of World Logistics, Inc., the Company borrowed $1,700,000 (including a temporary increase of $200,000) under this existing line of credit, while also issuing a note payable in the amount of $125,000. In addition, Janel entered into a term loan agreement with a different bank in the amount of $500,000 (see Note 2 to financial statements). At March 31, 2008, Janel had no remaining available borrowing under its line of credit. The outstanding balance of notes payable of $1,825,000 bears interest at prime less a three-quarters of one percent (0.75%) per annum and is collateralized by substantially all the assets of Janel and personal guarantees by certain shareholders of the Company. As of December 31, 2008, the Company had taken down the full $500,000 of available borrowing under its five-year term loan agreement, bearing interest at 7.25% per annum, collateralized by substantially all the assets of Janel and personal guarantees by certain shareholders of the Company. As a subsequent event, in April 2008, the outstanding bank note payable of $1,700,000 was converted into a term loan payable in monthly installments of $20,238 plus interest at the bank's prime rate plus 0.75% per

annum, or LIBOR plus 2% per annum. In addition, the bank gave the Company a new credit line of $1,500,000, which expires on March 31, 2009.

Management believes that anticipated cash flow is sufficient to meet its current working capital and operating needs. However, the Company is also proceeding with its comprehensive growth strategy for fiscal 2008 and beyond, which encompasses a number of potential elements, as discussed below under "Current Outlook." To successfully execute several of these growth strategy elements in the coming months, the Company may need to secure additional financing estimated at up to $10,000,000. There is no assurance that such additional capital as necessary to execute the Company's business plan and intended growth strategy will be available or, if available, will be extended to the Company at mutually acceptable terms.

## Current Outlook

Janel is primarily engaged in the business of providing full-service cargo transportation logistics management, including freight forwarding via air, ocean and land-based carriers, customs brokerage services, warehousing and distribution services, and other value-added logistics services and in the business of computer software sales, support and maintenance. Its results of operations are affected by the general economic cycle, particularly as it influences global trade levels and specifically the import and export activities of Janel's various current and prospective customers.

Historically, the Company's quarterly results of operations have been subject to seasonal trends which have been the result of, or influenced by, numerous factors including climate, national holidays, consumer demand, economic conditions, the growth and diversification of its international network and service offerings, and other similar and subtle forces.

Management has been engaged in reviewing the profitability of various customer accounts with a view toward eliminating accounts which are only marginally profitable, and focusing on accounts that are more profitable, with a view to increasing its overall profit margin. Based upon the results for the six months ended March 31, 2008, and its current expectations for the remainder of fiscal 2008, Janel projects that gross revenue from its currently existing accounts and businesses for its fiscal year ending September 30, 2008, will grow by approximately 5-10% to approximately $78-$82 million.

Janel is continuing to implement its business plan and strategy to increase revenue and profitability through its fiscal year ending September 30, 2008 and beyond. The Company's strategy, some of which has been implemented, includes plans to: open additional branch offices both domestically and in Southeast Asia; increase profit margins by avoiding low-margin business; introduce additional revenue streams for its existing headquarters and branch locations; proceed with negotiations and due diligence with privately held transportation-related firms which may ultimately lead to their acquisition by the Company; expand its existing sales force by hiring additional commission-only sales representatives with established customer bases; increase its focus on growing revenue related to export activities; evaluate direct entry into the trucking and warehouse distribution business as a complement to the services already provided to existing customers; and continue its efforts to reduce current and prospective overhead and

operating expenses, particularly with regard to the efficient integration of any additional offices or acquisitions.

Certain elements of the Company's growth strategy, principally proposals for acquisition, are contingent upon the availability of adequate financing at terms acceptable to the Company. The Company is continuing in its efforts to secure long-term financing, but has to date been unable to complete any such financing transactions at terms it deems acceptable, and cannot presently anticipate when or if financing on acceptable terms will become available. Therefore, the implementation of significant aspects of the Company's strategic growth plan may be deferred beyond the originally anticipated timing.

## Critical Accounting Policies and Estimates

Management's Discussion and Analysis of Financial Condition and Results of Operations discusses the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Since future events and their effects cannot be determined with absolute certainty, the determination of estimates requires the exercise of judgment. Actual results could differ from those estimates, and such difference may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates as to the appropriate carrying value of certain assets and liabilities which are not readily apparent from other sources, primarily allowance for doubtful accounts, accruals for transportation and other direct costs, and accruals for cargo insurance. Management bases its estimates on historical experience and on various assumptions which are believed to be reasonable under the circumstances. We reevaluate these significant factors as facts and circumstances change. Historically, actual results have not differed significantly from our estimates. These accounting policies are described at relevant sections in this discussion and analysis and in the notes to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended September 30, 2007.

Management believes that the nature of the Company's business is such that there are few, if any, complex challenges in accounting for operations. Revenue recognition is considered the critical accounting policy due to the complexity of arranging and managing global logistics and supply-chain management transactions.

## Revenue Recognition

A. Full Service Cargo Transportation Logistics Management

Revenues are derived from airfreight, ocean freight and custom brokerage services. The Company is a non-asset-based carrier and accordingly does not own transportation assets. The Company generates the major portion of its air and ocean freight revenues by purchasing transportation services from direct carriers (airlines, steam ship lines, etc.) and reselling those services to its customers. By consolidating shipments from multiple customers and availing itself

of its buying power, the Company is able to negotiate favorable rates from the direct carriers, while offering to its customers lower rates than the customers could obtain themselves.

Airfreight revenues include the charges for carrying the shipments when the Company acts as a freight consolidator. Ocean freight revenues include the charges for carrying the shipments when the Company acts as a Non-Vessel Operating Common Carrier (NVOCC). In each case, the Company is acting as an indirect carrier. When acting as an indirect carrier, the Company will issue a House Airway Bill (HAWB) or a House Ocean Bill of Lading (HOBL) to customers as the contract of carriage. In turn, when the freight is physically tendered to a direct carrier, the Company receives a contract of carriage known as a Master Airway Bill for airfreight shipments and a Master Ocean Bill of Lading for ocean shipments. At this point the risk of loss passes to the carrier, however, in order to claim for any such loss, the customer is first obligated to pay the freight charges.

Based upon the terms in the contract of carriage, revenues related to shipments where the Company issues a HAWB or a HOBL are recognized at the time the freight is tendered to the direct carrier. Costs related to the shipments are recognized at the same time.

Revenues realized when the Company acts as an agent for the shipper and does not issue a HAWB or a HOBL include only the commission and fees earned for the services performed. These revenues are recognized upon completion of the services.

Customs brokerage and other services involve providing multiple services at destination including clearing shipments through customs by preparing required documentation, calculating and providing for payment of duties and other charges on behalf of the customers, arranging for any required inspections, and arranging for final delivery. These revenues are recognized upon completion of the services.

The movement of freight may require multiple services. In most instances the Company may perform multiple services including destination break-bulk and value added services such as local transportation, distribution services and logistics management. Each of these services has separate fee that is recognized as revenue upon completion of the service.

Customers will frequently request an all-inclusive rate for a set of services that is known in the industry as "door-to-door services." In these cases, the customer is billed a single rate for all services from pickup at origin to delivery. The allocation of revenue and expense among the components of services when provided under an all inclusive rate are done in an objective manner on a fair value basis in accordance with Emerging Issues Task Force (EITF) 00-21, "Revenue Arrangements with Multiple Deliverables."

B. Computer Software Sales, Support and Maintenance

The Company recognizes revenue, including multiple element arrangements, in accordance with the provisions of the SEC's Staff Accounting bulletin ("SAB") No. 104, *Revenue Recognition*, and the Financial Accounting Standards Board's ("FASB"), and EITF 00-21, *Revenue Agreements with Multiple Deliverables*. Revenue from the sale of the Company's

products and services are recognized when persuasive evidence of an arrangement exists, delivery has occurred (or services have been rendered), the price is fixed or determinable, and collectability is reasonably assured. Amounts billed in excess of revenue recognized are recorded as deferred revenue in the balance sheet.

**Estimates**

While judgments and estimates are a necessary component of any system of accounting, the Company's use of estimates is limited primarily to the following areas that in the aggregate are not a major component of the Company's consolidated statements of income:

>     a.   accounts receivable valuation;
>     b.   the useful lives of long-term assets;
>     c.   the accrual of costs related to ancillary services the Company provides; and
>     d.   accrual of tax expense on an interim basis.

Management believes that the methods utilized in all of these areas are non-aggressive in approach and consistent in application. Management believes that there are limited, if any, alternative accounting principles or methods which could be applied to the Company's transactions. While the use of estimates means that actual future results may be different from those contemplated by the estimates, the Company believes that alternative principles and methods used for making such estimates would not produce materially different results than those reported.

**Item 3   Quantitative and Qualitative Disclosures About Market Risk.**

Not applicable.

**Item 4.   Controls and Procedures.**

We maintain a system of disclosure controls and procedures that is designed to provide reasonable assurance that information, which is required to be disclosed by the Company in the reports that it files or submits under the Securities and Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and is accumulated and communicated to management in a timely manner. Our Chief Executive Officer and Chief Financial Officer have evaluated this system of disclosure controls and procedures as of the end of the period covered by this quarterly report, and believe that the system is effective. There have been no changes in our internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II - OTHER INFORMATION

**Item 1.  Legal Proceedings.**

Not Applicable

**Item 2.  Unregistered Sale of Equity Securities and Use of Proceeds.**

**(a)**      Not applicable.

**(c)**      ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Month #1 (identify beginning and ending dates) | 1-1-08/1-31-08 -0- | -0- | -0- | 163,000 |
| Month #2 (identify beginning and ending dates) | 2-1-08/2-29-08 -0- | -0- | -0- | 163,000 |
| Month #3 (identify beginning and ending dates) | 3-1-08/3-31-08 -0- | -0- | -0- | 163,000 |
| Total | -0- | -0- | -0- | 163,000 |

**Item 3.  Defaults Upon Senior Securities.**

Not applicable.

**Item 4.  Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of shareholders during the first fiscal quarter ended March 31, 2008.

**Item 5.  Other Information.**

Not applicable.

**Item 6.  Exhibits and Reports on Form 8-K.**

(a) Exhibits required by item 601 of Regulation S-K.

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 31 | Rule 13(a)-14(a)/15(d)-14(a) Certifications. |
| 32 | Section 1350 Certification. |

(b)    <u>Reports on Form 8-K</u>.  The Company has not filed any reports on Form 8-K during the second fiscal quarter ended March 31, 2008.

## <u>SIGNATURES</u>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

May 15, 2008

**JANEL WORLD TRADE, LTD.**

By:    /s/ James N. Jannello
       Chief Executive Officer

**EXHIBIT 31**

## Certification

I, James N. Jannello, Executive Vice President and Chief Executive Officer of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a -15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008                                   /s/ James N. Jannello

### Certification

I, Stephen P. Cesarski, President and Chief Operating Officer, of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008                                      /s/ Stephen. P. Cesarski

Certification

I, Linda Bieler, Controller and Chief Financial and Accounting Officer, of Janel World Trade, Ltd., certify that:

1. I have reviewed this report on Form 10-Q of Janel World Trade, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: May 15, 2008                    /s/ Linda Bieler

**EXHIBIT 32**

CERTIFICATION
PURSUANT TO 18 U.S.C. §1350

In connection with the report on Form 10-Q of Janel World Trade, Ltd. for the second fiscal quarter ended March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the registrant certifies pursuant to 18 U.S.C. Section 1350 that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Dated: May 15, 2008                                   /s/ James N. Jannello
                                                       James N. Jannello, Executive
                                                       Vice President and Chief
                                                       Executive Officer

Dated: May 15, 2008                                   /s/Stephan P. Cesarski
                                                       President and Chief
                                                       Operating Officer

Dated: May 15, 2008                                   /s/Linda Bieler
                                                       Controller and Chief
                                                       Financial and Accounting
                                                       Officer

**JANEL WORLD TRADE LTD. AND SUBSIDIARIES**

CONSOLIDATED BALANCE SHEETS

| | MARCH 31, 2008 (Unaudited) | SEPTEMBER 30, 2007 (Audited) |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 1,597,609 | $2,469,727 |
| Accounts receivable, net of allowance for doubtful accounts of $48,923 at March 31, 2008 and $42,600 at September 30, 2007 | 5,421,324 | 5,343,958 |
| Marketable securities | 62,164 | 70,880 |
| Loans receivable – officers | 145,760 | 142,440 |
|             - related party | 115,151 | 111,700 |
|             - other | 27,033 | 21,994 |
| Prepaid expenses and sundry current assets | 145,088 | 156,802 |
| **TOTAL CURRENT ASSETS** | **7,514,129** | **8,317,501** |
| **PROPERTY AND EQUIPMENT, NET** | **343,168** | **217,528** |
| **OTHER ASSETS:** | | |
| Intangible assets, net | 3,399,688 | - |
| Security deposits | 49,035 | 49,035 |
| Deferred income taxes | 67,000 | - |
| **TOTAL OTHER ASSETS** | **3,515,723** | **49,035** |
| **TOTAL ASSETS** | **$11,373,020** | **$8,584,064** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Note payable – bank | $ 1,700,000 | $ - |
|             - other | 125,000 | - |
| Accounts payable | 3,095,753 | 3,822,677 |
| Accrued expenses and taxes payable | 136,749 | 205,555 |
| Current portion of long-term debt | 73,239 | 3,795 |
| **TOTAL CURRENT LIABILITIES** | **5,130,741** | **4,032,027** |
| **OTHER LIABILITIES:** | | |
| Long-term debt | 431,213 | 2,550 |
| Deferred compensation | 78,568 | 78,568 |
| **TOTAL OTHER LIABILITIES** | **509,781** | **81,118** |
| **STOCKHOLDERS' EQUITY:** | **5,732,498** | **4,470,919** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$11,373,020** | **$8,584,064** |

{ }

See notes to financial statements

{ }

**JANEL WORLD TRADE LTD. AND SUBSIDIARIES**

CONSOLIDATED STATEMENTS OF INCOME
(Unaudited)

| | SIX MONTHS ENDED MARCH 31, | | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| **REVENUES** | $38,349,307 | $35,031,459 | $18,281,961 | $18,303,590 |
| **COSTS AND EXPENSES:** | | | | |
| Forwarding expenses | 33,483,443 | 31,144,581 | 15,934,980 | 16,340,327 |
| Selling, general and administrative | 4,666,805 | 3,754,920 | 2,366,265 | 1,910,744 |
| Amortization of intangible assets | 323,625 | - | 161,813 | - |
| **TOTAL COSTS AND EXPENSES** | 38,473,873 | 34,899,501 | 18,463,058 | 18,251,071 |
| **INCOME (LOSS) FROM OPERATIONS** | (124,566) | 131,958 | (181,097) | 52,519 |
| **OTHER ITEMS:** | | | | |
| Interest and dividend income | 28,915 | 24,581 | 11,661 | 11,640 |
| Interest expense | (63,120) | (323) | (29,484) | (141) |
| **TOTAL OTHER ITEMS** | (34,025) | 24,258 | (17,823) | 11,499 |
| **INCOME (LOSS) BEFORE INCOME TAXES** | (158,771) | 156,216 | (198,920) | 64,018 |
| Income taxes | (18,000) | 67,000 | (36,100) | 27,000 |
| **NET INCOME (LOSS)** | (140,771) | 89,216 | (162,820) | 37,018 |
| Preferred stock dividends | 7,500 | 3,333 | 3,750 | 3,333 |
| **NET INCOME AVAILABLE TO COMMON STOCKHOLDERS** | $ (148,271) | $ 85,883 | $ (166,570) | $ 33,685 |
| **OTHER COMPREHENSIVE INCOME NET OF TAX:** | | | | |
| Unrealized gain(loss) from available for sale securities | $ (15,150) | $ 1,624 | $ (8,142) | $ 927 |
| Basic earnings (loss) per share | $ (.0088) | $ .005 | $ (.0099) | $ .005 |
| Fully diluted earnings (loss) per share | $ (.0086) | $ .005 | $ (.0096) | $ .005 |
| Weighted number of shares outstanding | 16,906,000 | 17,021,973 | 16,906,000 | 17,007,167 |
| Fully diluted weighted number of shares outstanding | 17,306,000 | 17,421,973 | 17,306,000 | 17,407,167 |

{ }

See notes to financial statements

{ }

# JANEL WORLD TRADE LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | CAPITAL STOCK | | PREFERRED STOCK | | TREASURY STOCK | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE GAIN (LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | SHARES | $ | SHARES | $ | | | | | |
| BALANCE – SEPTEMBER 30, 2007 | 17,043,000 | $17,043 | 1,000,000 | $1,000 | $(65,812) | $1,416,558 | $3,090,470 | $11,660 | $4,470,919 |
| Net income | - | - | - | - | - | - | (140,771) | - | (140,771) |
| Convertible preferred stock issuance | - | - | 285,000 | 285 | - | 1,424,715 | - | - | 1,425,000 |
| Dividends to preferred shareholders | - | - | - | - | - | - | (7,500) | - | (7,500) |
| Other comprehensive gains (losses): Unrealized gains (losses) on available-for-sale marketable securities | - | - | - | - | - | - | - | (15,150) | (15,150) |
| BALANCE – MARCH 31, 2008 | 17,043,000 | $17,043 | 1,285,000 | $1,285 | $(65,812) | $2,841,273 | $2,942,199 | $ (3,490) | $5,732,490 |

See notes to financial statements

{}

## JANEL WORLD TRADE LTD. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | CAPITAL STOCK | | PREFERRED STOCK | | TREASURY STOCK | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE GAIN (LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | SHARES | $ | SHARES | $ | | | | | |
| **BALANCE – SEPTEMBER 30, 2006** | 17,043,000 | $17,043 | - | $ - | $ - | $ 953,163 | $2,778,324 | $ 2,763 | $3,751,293 |
| Net income | - | - | - | - | - | - | 89,216 | - | 89,216 |
| Convertible preferred stock issuance, net of expenses of $35,605 | - | - | 1,000,000 | 1,000 | - | 463,395 | - | - | 464,395 |
| Purchase of 57,000 shares of treasury stock | - | - | - | - | (28,122) | - | - | - | (28,122) |
| Dividends to preferred shareholders | - | - | - | - | - | - | (3,333) | - | (3,333) |
| Other comprehensive gains: | | | | | | | | | |
| Unrealized gains on available-for-sale marketable securities | - | - | - | - | - | - | - | 1,624 | 1,624 |
| **BALANCE – MARCH 31, 2007** | 17,043,000 | $17,043 | 1,000,000 | $1,000 | $(28,122) | $1,416,558 | $2,864,207 | $ 4,387 | $4,275,073 |

See notes to financial statements

{ }

**JANEL WORLD TRADE, LTD. AND SUBSIDIARIES**

CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| | SIX MONTHS ENDED MARCH 31, | |
| --- | ---: | ---: |
| | 2008 | 2007 |
| **OPERATING ACTIVITIES:** | | |
| Net income (loss) | $ (140,771) | $ 89,216 |
| *Adjustments to reconcile net income (loss) to net* | | |
| *cash provided by (used in) operating activities:* | | |
| Depreciation and amortization | 387,282 | 37,614 |
| Deferred income taxes | (67,000) | - |
| *Changes in operating assets and liabilities:* | | |
| Accounts receivable | (77,366) | 197,993 |
| Loans receivable | (11,810) | - |
| Prepaid expenses and sundry current assets | 11,714 | 42,693 |
| Accounts payable and accrued expenses | (803,230) | 247,350 |
| **NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES** | **(701,181)** | **614,866** |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisition of intangible assets | (2,173,313) | - |
| Acquisition of property and equipment | (189,297) | (27,876) |
| Purchase of marketable securities | (6,434) | (2,726) |
| **NET CASH USED IN INVESTING ACTIVITIES** | **(2,369,044)** | **(30,602)** |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Proceeds received from bank loan | 1,700,000 | - |
| Issuance of long-term debt | 500,000 | - |
| Repayment of long-term debt | (1,893) | (4,193) |
| Issuance of loans receivable | - | 4,568 |
| Repurchase of treasury stock | - | (28,122) |
| Proceeds from sale of preferred stock, net of related expense of $35,605 | - | 464,395 |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | **2,198,107** | **436,648** |
| | | |
| **INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | **(872,118)** | **1,020,912** |
| **CASH AND CASH EQUIVALENTS – BEGINNING OF PERIOD** | **2,469,727** | **1,341,952** |
| **CASH AND CASH EQUIVALENTS – END OF PERIOD** | **$1,597,609** | **$2,362,864** |
| | | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | |
| *Cash paid during the period for:* | | |
| Interest | $ 63,120 | $ (323) |
| Income taxes | $ 151,448 | $ - |
| *Non-cash financing activities:* | | |
| Unrealized gain (loss) on marketable securities | $ (15,150) | $ 1,624 |
| Dividends declared to preferred stockholders | $ (7,500) | $ (3,333) |
| Issuance of convertible preferred stock and note payable | | |
| in connection with business acquisition | $1,550,000 | $ - |

{ }

See notes to financial statements

{ }

**JANEL WORLD TRADE, LTD. AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

MARCH 31, 2008
(Unaudited)

## 1   BASIS OF PRESENTATION

The attached consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. As a result, certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted. The Company believes that the disclosures made are adequate to make the information presented not misleading. The consolidated financial statements reflect all adjustments which are, in the opinion of management, necessary to a fair statement of the results for the interim periods presented. These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes included in the Company's Form 10-K as filed with the Securities and Exchange Commission on or about January 14, 2008.

## 2   ACQUISITION OF ORDER LOGISTICS INC.

On October 18, 2007, Janel World Trade, Ltd. (the "Company") acquired certain assets of Order Logistics, Inc. ("OLI") consisting of proprietary technology, intellectual property (including the name "Order Logistics"), office locations and equipment and customer lists for use in the management and expansion of the Company's international integrated logistics transport services business. The technology acquired by the Company enables it to integrate all of the different aspects of movement and delivery of goods, making the entire process electronically visible in "real time". The Agreement includes non-competition provisions restricting OLI from competing with Janel, and requiring OLI to change its name.

The purchase price for the acquired assets was $3,888,429 and is comprised of $2,338,429 cash paid at closing, the issuance of a $125,000 note payable and the issuance of 285,000 restricted shares of Janel's newly-authorized $.001 par value Series B Convertible Preferred Stock ("Series B"), each share of which is convertible into ten shares of Janel's $.001 par value common stock at any time after October 18, 2009. In connection therewith, the Company borrowed $1,700,000 under its existing line of credit and entered into a term loan agreement for $500,000 with a different bank. The balance of the cash portion was paid from existing cash.

On February 11, 2008, The Company filed a lawsuit in the United States District Court for the Southern District of New York against defendants World Logistics Services, Inc. ("World Logistics"), a Delaware Corporation formerly known as "Order Logistics, Inc."; Richard S. Francis ("Francis"), the President of World Logistics; and Brian P. Griffin ("Griffin"), who was the Chief Executive Officer of World Logistics when Janel completed an acquisition in October 2007 of certain World Logistics assets.

Janel claims that the defendants made false and misleading statements of material facts concerning the exclusivity of the rights to the assets which were sold to Janel by having concealed and withheld the provisions of a settlement agreement with a third-party business associate and creditor made only two days before the closing of the asset sale, in which World Logistics agreed to the cancellation of a restrictive covenant which had prevented the creditor from using World Logistics proprietary computer software, or soliciting its list of valuable customers and employees.

Janel has charged that the defendants violated the anti-fraud provisions of the Federal securities laws, committed common law fraud, breach of contract and other wrongdoing, with the specific intent to defraud Janel and obtain 285,000 shares of its newly authorized Class B convertible preferred

{ }

stock, and more than $2,300,000 in payments by Janel of the defendants' long overdue obligations to suppliers, creditors and tax authorities.

**3    BUSINESS SEGMENT INFORMATION**

The Company is organized into two reportable segments, full service cargo transportation logistics management and computer software sales, support and maintenance.

| Six Months Ended March 31, 2008 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 38,349,307 | $ 38,031,108 | $ 318,199 |
| Net revenues | $ 4,865,864 | $ 4,547,665 | $ 318,199 |
| Operating income (loss) | $ (124,566) | $ 323,183 | $ (447,749) |
| Identifiable assets | $ 11,373,020 | $ 7,623,097 | $ 3,749,923 |
| Capital expenditures | $ 189,297 | $ 22,816 | $ 166,481 |
| Depreciation and amortization | $ 387,282 | $ 47,077 | $ 340,205 |
| Equity | $ 5,732,498 | $ 6,180,247 | $ (447,749) |

| Six Months Ended March 31, 2007 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 35,031,459 | $ 35,031,459 | $ - |
| Net revenues | $ 3,886,878 | $ 3,886,878 | $ - |
| Operating income | $ 131,635 | $ 131,635 | $ - |
| Identifiable assets | $ 7,513,361 | $ 7,513,361 | $ - |
| Capital expenditures | $ 27,876 | $ 27,876 | $ - |
| Depreciation and amortization | $ 37,614 | $ 37,614 | $ - |
| Equity | $ 4,275,073 | $ 4,275,073 | $ - |

| Three Months Ended March 31, 2008 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 18,281,961 | $ 18,219,061 | $ 62,900 |
| Net revenues | $ 2,346,981 | $ 2,284,081 | $ 62,900 |
| Operating income (loss) | $ (181,097) | $ 499,122 | $ (318,025) |
| Identifiable assets | $ 11,373,020 | $ 7,623,097 | $ 3,749,923 |
| Capital expenditures | $ 17,801 | $ 16,437 | $ 1,364 |
| Depreciation and amortization | $ 194,146 | $ 24,010 | $ 170,136 |
| Equity | $ 5,732,498 | $ 6,180,247 | $ (447,749) |

| Three Months Ended March 31, 2007 | Consolidated | Transportation Logistics | Computer Software |
|---|---|---|---|
| Total revenues | $ 18,303,590 | $ 18,303,590 | $ - |
| Net revenues | $ 1,963,263 | $ 1,963,263 | $ - |
| Operating income | $ 52,378 | $ 52,378 | $ - |
| Identifiable assets | $ 6,743,091 | $ 6,743,091 | $ - |
| Capital expenditures | $ 22,095 | $ 22,095 | $ - |

{ }

| | | | | | |
|---|---|---|---|---|---|
| Depreciation and amortization | $ | 19,540 | $ | 19,540 | $ - |
| Equity | $ | 4,275,073 | $ | 4,275,073 | $ - |

4    **SUBSEQUENT EVENT**

In April 2008, the outstanding note payable – bank of $1,700,000 was converted into a term loan payable in monthly installments of $20,238 plus interest at the bank's prime rate plus .75% per annum, or LIBOR plus 2% per annum. In addition, the bank gave the Company a new credit line of $1,500,000 which expires on March 31, 2009.

{ }